Alexander WILSON, individually and as representative of all minority shareholders of Chenango Industries, Inc., other than defendants on and before October 18, 1979, Plaintiff,

v.

GREAT AMERICAN INDUSTRIES, INC., as a corporate entity and as a sole shareholder of Chenango Industries, Inc., Milton Koffman, Burton I. Koffman, Richard E. Koffman, as directors of Great American Industries, Inc., Chenango Industries, Inc., Joseph M. Stack as the representative of Chenango Industries in the merger between Chenango and Great American Industries, and Gary Crounse, David Keith Dyer and Sharon Lee Dyer, as Co-Executors of the Estate of David L. Dyer, Deceased, William Starner, and Anthony Mincolla as directors of Chenango Industries, Inc., Defendants.

No. 80–CV–841.

United States District Court,
N.D. New York.

June 12, 1987.

Coughlin & Gerhart, Binghamton, N.Y., for plaintiff; Peter H. Bouman, of counsel.

Schwab & Hudanich, Binghamton, N.Y., Beveridge & Diamond, Washington, D.C., for defendants; Manual Schwab, Binghamton, N.Y., John N. Hanson, John S. Guttmann, Washington, D.C., of counsel.

Hancock & Estabrook, Syracuse, N.Y., for defendant Chenango Industries; Donald Kemple, of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

This action has been brought by plaintiff Alexander Wilson against defendants Great American Industries, Inc. (GAI), Milton Koffman, Burton I. Koffman, Richard E. Koffman, Chenango Industries, Inc. (Chenango or Chenango I), Joseph M. Stack, Gary Crounse, David Keith Dyer and Sharon Lee Dyer as co-executors of the estate of David L. Dyer, William Starner, and Anthony Mincolla to challenge the legality, *inter alia,* of a joint proxy/prospectus (proxy) issued by GAI and Chenango in conjunction with a merger of the companies that occurred in 1979. As a result of the merger, Chenango became a wholly-owned subsidiary of GAI.

The complaint contains claims that a variety of federal securities laws were violated due to alleged misrepresentations and omissions in the proxy. The complaint also contains a pendent New York State law claim involving an alleged breach of fiduciary duty by the Chenango board of directors in voting to approve the merger with GAI.

The court has previously granted the plaintiff's motion for class certification and denied the parties' motions for summary judgment. Trial began on February 11, 1987 and concluded on March 5, 1987. At the conclusion of the trial, and for reasons stated on the trial record, the court dismissed the plaintiff's federal securities law claim based on an alleged violation of 15 U.S.C. § 77k (Section 11 of the Securities Act of 1933) and the pendent state law claim. This memorandum opinion, which for convenience will intertwine factual findings with legal conclusions, will address the remaining claims and is issued by the court in accordance with Fed.R.Civ.P. 52(a).

## Background

The basic chronology of events leading up to the merger of GAI and Chenango has never been the subject of serious dispute by the parties. The court does note, though, that the corporate structure of GAI has changed dramatically since the time of the merger. The company, whose shares were previously traded on the American Stock Exchange, has since the time of the merger, gone private. However, as that change has little, if any, relevance to the issues before the court, the status of GAI, as well as of the other parties, will be addressed as it existed at the times relevant to this action.

GAI was incorporated in Delaware and is based in Binghamton, New York. It has a number of subsidiaries that are involved in a wide range of enterprises, from the manufacturing and marketing of closed cellular rubber products to the sale of scuba equipment. At times relevant to this action, Milton Koffman was Treasurer and Secretary of GAI and a member of its board of directors. He also served as a director of Chenango. Burton Koffman was President of GAI and Chairman of its board of directors. Richard Koffman was a GAI board member as well. The Koffmans, and interests that they controlled, owned approximately twenty-eight percent of GAI's outstanding shares at the time of the merger. They also owned the same percentage of Chenango's shares.

Prior to the merger with GAI, Chenango was a New York corporation based in Vestal, New York. The company was founded in 1967 by Joseph Stack, and its shares were traded over the counter. Chenango, which as a company has generally been involved with the electronics and computer industries, is known as a "job shop." It does not design its own products, and it has no engineering department. Rather, the vast majority of its business comes from installing electrical components on circuit boards for large corporate customers such as IBM.

At the time of the merger, Joseph Stack was President of Chenango and Chairman of its board of directors. Gary Crounse was Chenango's Vice-President and General Manager and also served on the board. David L. Dyer, who is now deceased, was a partner in the Binghamton law firm of Levene, Gouldin & Thompson. He was Chenango's Secretary and General Counsel and a member of its board. As will be addressed shortly, on occasion, Dyer and his law firm represented the Koffmans and some of the companies that they controlled. William Starner was Chenango's Sales Manager and a board member, and Anthony Mincolla was a private businessman and a Chenango board member.

The process that culminated in the merger of GAI and Chenango began in June of 1978. Joseph Stack believed that in order for Chenango to grow, it needed to become part of a larger company with greater resources. He had known the Koffmans for many years, and he began discussing with Milton Koffman the possibility of merging Chenango with GAI. Milton Koffman's initial reaction to the idea was favorable, and he in turn discussed it with several GAI board members. They also found merit to the idea of merging the companies, and

GAI began to formally study the possibility of a merger.

GAI officials examined Chenango's business and financial condition and reported to GAI management on their findings. On October 20, 1978, Milton Koffman, Burton Koffman, and William Lyons, who is not a defendant in this action, met in their capacity as GAI's executive committee. At that meeting, they decided to recommend to the GAI board that the company give serious consideration to the idea of merging with Chenango. Some of the conditions of a potential merger were discussed, and Stack, who was later informed of the substance of the meeting, generally posed no objections to the conditions. One area with which he was concerned, however, involved the tax consequences of the merger for Chenango shareholders. Stack had a strong preference that any merger should result in a tax-free exchange for his shareholders, and he made his preference known to the GAI board.

On November 14, 1978, the entire GAI board met to consider the merger but concluded after some discussion that further review was warranted before any final decision could be reached. At a meeting on January 30, 1979, the board, absent the Koffmans, who were Chenango shareholders, decided that a merger would be beneficial to GAI, and a special committee was appointed to negotiate the final terms of the merger. Those negotiations continued until the spring of 1979. Finally, at a board meeting on June 18, 1979, the GAI board formally authorized the merger with Chenango.

Stack was Chenango's sole negotiator for the merger, and he apparently did not apprise the other Chenango board members of much of what was transpiring. Although Stack did testify that he did discuss the merger with the other board members, it is clear to the court that by the time of the June 25, 1979 Chenango board meeting, the other Chenango board members were not well informed of many of the details regarding the merger. After Stack made a presentation to the board at that meeting, its members obviously concluded that they had sufficient information to vote on the merger. They did so, by giving their approval to the merger with GAI.

On June 28, 1979, Stack and Burton Koffman entered into a formal agreement to merge Chenango into GAI. Subsequently, the proxy that is the subject of this action was prepared, and it was sent to Chenango's shareholders on September 27, 1979.

The basic terms of the merger were as follows: (1) GAI acquired Chenango for the book value of its stock, which totaled approximately $1,200,000; (2) Chenango's shareholders exchanged their Chenango shares, which individually had a book value of $4.00, for newly issued GAI Series B preferred stock with a $10.00 per share par value. Accordingly, the exchange was made at a rate of two and a half Chenango shares for each share of GAI Series B preferred; (3) GAI Series B preferred stock would pay a six percent annual dividend; (4) GAI Series B preferred stock could be converted into GAI common stock at a rate of six Series B preferred shares for five shares of GAI common stock; (5) GAI had the right to redeem Series B preferred stock for $10.00 per share after five years; and (6) Chenango shareholders who owned fewer than 110 shares could receive $5.00 per share instead of exchanging their stock for GAI Series B preferred.

A meeting of Chenango's shareholders was held on October 18, 1979 in order for the shareholders to vote on the merger. The plaintiff, along with the majority of the other shareholders, voted in favor of the merger. Five shareholders, who owned 4,500 of Chenango's 300,777 outstanding shares, dissented. The transaction officially closed on October 31, 1979, and Chenango became Chenango II, a wholly-owned subsidiary of GAI. After the merger, an appraisal was done, and cash settlements were reached with those shareholders who dissented from the merger.

## Discussion

Currently before the court for its determination are the issues of whether the proxy issued in conjunction with the merger contained misrepresentations and/or

omissions of material fact and whether any or all of four federal securities laws were violated. Each statute in question, and in some instances, the accompanying regulations as well, contains different elements that must be met before a violation can be found. The crucial element that is common to all of the statutes, however, is that a misrepresentation or omission must be "material" before it can be actionable. If it is not, then no violation has occurred, regardless of whether any of the other elements for a violation of the statute have been met. The court will address the issue of materiality within the context of its discussion of the first statute in question, 15 U.S.C. § 78n(a) (Section 14(a) of the Securities Exchange Act of 1934). Because the four statutes in question share this element, the court's findings and conclusions in this regard are applicable to the other statutes and will not be repeated in later sections of the opinion.[1]

## I.

Section 14(a) of the Securities Exchange Act of 1934 is a general provision that provides:

> Solicitation of proxies in violation of rules and regulations
>
> (a) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

17 C.F.R. § 240.14a–9 (Rule 14a–9), which is promulgated under Section 14(a), provides:

> False or misleading statements.
>
> (a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written

or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading. (b) The fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made.

In order for a plaintiff to establish a violation of Section 14(a) and Rule 14a–9, a showing must be made that: (1) the proxy contains a material misrepresentation or omission; (2) the defendants were, at minimum, negligent; and (3) the proxy was the essential link in completing the transaction in question. *Halpern v. Armstrong,* 491 F.Supp. 365, 378 (S.D.N.Y.1980); *Fradkin v. Ernst,* 571 F.Supp. 829, 841–44 (N.D. Ohio 1983). The defendants have not contested that the proxy was the essential link in the accomplishment of the GAI–Chenango merger, and the court concludes that the causation element has been met. *See Sanders v. Thrall Car Manufacturing Co.,* 582 F.Supp. 945, 956–57 (S.D.N.Y. 1983), *aff'd,* 730 F.2d 910 (2d Cir.1984). The court must address, then, the issues of materiality and culpability. *See Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1298–1302 (2d Cir.1973).

The seminal case on the issue of materiality is *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), in which the Supreme Court stated:

---

**1.** The standard for materiality is the same for each of the statutes addressed.

The general standard of materiality that we think best comports with the policies of Rule 14a–9 is as follows: An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills* general description of materiality as a requirement that "the defect have a significant propensity to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.* at 449, 96 S.Ct. at 2132. *See also S.E.C. v. Tome,* 638 F.Supp. 596, 622 (S.D. N.Y.1986); *Berg v. First American Bankshares, Inc.,* 796 F.2d 489, 494–95 (D.C.Cir. 1986). In *Northway,* the Supreme Court also stated that:

Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good. The potential liability for a Rule 14a–9 violation can be great indeed, and if the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking. (footnote omitted).

426 U.S. at 448–49, 96 S.Ct. at 2131–32. With this objective standard of materiality in hand, the court will address the alleged misrepresentations and omissions that the plaintiff has claimed are material.[2]

### (A) *The United Rubber Decision*

On September 20, 1979, Judge Kevin Thomas Duffy of the United States District Court for the Southern District of New York issued an opinion in the case of *United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO v. Great American Industries, Inc.,* 479 F.Supp. 216 (S.D.N.Y.1979). That case concerned events that occurred in the early to mid–1960's and involved primarily a company called Linear, Inc., which at the time was a GAI subsidiary.

The opinion of Judge Duffy speaks for itself, but the court will briefly recap here for the purposes of the instant case. When Linear began to experience severe financial difficulties, it was unable to meet its obligations under a collective bargaining agreement to a number of its employees. The employees' union, as representative of the employees, sued Linear, along with GAI and two other GAI subsidiaries, to recover benefits that the employees believed they were owed. The court pierced the corporate veil and found that GAI and the two subsidiaries, Rubatex and Rubatex Holding, had engaged in a scheme to strip Linear of its assets to meet Linear's obligations to those parties. The result of this course of action was that once Linear effectively ceased operations, it had no money to meet its obligations to its employees. The court, in ruling in favor of the union, held that GAI itself, as well as Rubatex and Rubatex Holding, were liable to the union for at least some of the benefits of which its members were deprived. The court awarded damages of $183,592.94 as well as pension claims, the amount of which would be computed at a later date based on a formula set by the court.[3]

---

**2.** During the long history of this litigation, the plaintiff has seemingly shifted his concentration to certain alleged misrepresentations and omissions while abandoning others. The court's attention in this opinion will be directed to those allegations addressed during trial.

**3.** The final damage award was just under $990,-000. During the pendency of the appeal, the parties settled for $850,000.

The proxy for the GAI–Chenango merger did mention the *United Rubber* litigation, but because the defendants were not informed of the decision until October 5, 1979, no mention was made that a decision against GAI and its subsidiaries had been rendered. The plaintiff has never contended that the proxy mailed to Chenango shareholders on September 27, 1979 should have mentioned the outcome of the litigation. Rather, the plaintiff's position is that a supplemental mailing should have been sent to the shareholders informing them of the decision as soon as it was known.

The defendants assert that the *United Rubber* decision was not material to the question of the GAI–Chenango merger and would not have been considered by a reasonable shareholder in making a decision on the merger. Initially, the defendants argue that the events that were the subject of the case were twelve to fifteen years before the merger and involved a completely different group of GAI officers and directors.[4] Further, the defendants argue that a regulation of the Securities and Exchange Commission (SEC), 17 C.F.R. § 229.103, does not require disclosure of litigation that involves a claim for damages that does not exceed ten percent of a corporation's assets. The damages found in *United Rubber*, even after the calculation of the pension claims, did not exceed ten percent of GAI's assets, which in 1979 were over $35,000,000.

Although the court finds some validity to the defendants' position, and will address it again as to culpability under this section, the court is constrained to conclude that the decision in *United Rubber* was material information of which the Chenango shareholders should have been informed. Although it may not have changed the minds of any of the shareholders, there was a "substantial likelihood" that the decision would have been viewed by the reasonable investor as having "altered the 'total mix' of information made available." *Northway*, 426 U.S. at 449, 96 S.Ct. at 2132.

(B) *David L. Dyer*

■ As stated previously, David L. Dyer was a partner in the Binghamton law firm of Levene, Gouldin & Thompson, and although he was a Chenango officer and board member, he and his firm occasionally did legal work for the Koffmans. The Koffmans have been involved in a wide range of corporate ventures, and Levene, Gouldin & Thompson did legal work on the incorporation of such Koffman companies as Thrift Credit Corporation and Belkoff, Inc. Further, Levene, Gouldin lawyers, Dyer included, would sometimes serve as directors of these companies until the first meetings of shareholders.

The proxy stated on page 52 under the heading "LEGAL MATTERS" that:

> The law firm of Levene, Gouldin & Thompson, Binghamton, New York, has represented Chenango in connection with the Merger. Mr. David L. Dyer, a partner in that firm, is a member of the Board of Directors of Chenango and owns 105 shares of Chenango Common Stock.

The plaintiff contends that a conflict of interest resulted from Dyer's representation of Chenango regarding the merger and his previous representation of the Koffmans and some of their companies. Consequently, the plaintiff further contends that the failure of the defendants to mention Levene, Gouldin's relationship with the Koffmans in the proxy constituted a material omission.

The defendants assert that the plaintiff is claiming nothing more than a failure to disclose an alleged breach of fiduciary duty, and that such a claim cannot be bootstrapped into a federal securities law claim. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 478–80, 97 S.Ct. 1292, 1303–04, 51 L.Ed.2d 480 (1977); *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 4 (2d Cir.1983). However, while an allegation involving a breach of fiduciary duty is within the province of state law, a failure

---

**4.** Douglas Garrett, who shortly before the merger was appointed President of Rubatex, worked for that company at the time of the events in the case and was mentioned in Judge Duffy's opinion as having been involved in wrongdoing. He is not and has never been an officer or director of GAI.

to disclose a relationship between interested parties that might assume significance in the deliberations of a reasonable shareholder is within the province of the federal securities laws. That such a disclosure might implicitly involve a claimed conflict of interest does not remove it from scrutiny under federal law. *Kas v. Financial General Bankshares, Inc.*, 796 F.2d 508, 511–17 (D.C.Cir.1986). The key is the disclosure of the relationship, not whether such a relationship also constitutes a conflict of interest and breach of fiduciary duty. Such a disclosure will give notice to a shareholder to examine the proposed transaction more critically. *Id.* at 513.

Having drawn this conclusion, the court still cannot hold that the failure to disclose the Levene, Gouldin representation of the Koffmans amounted to a material omission. In *Kas*, for instance, the disclosure in question involved the fact that the attorneys acting on one side of the transaction also served as directors and officers for the main party on the opposite side of the same transaction. Those attorneys also performed legal work and served as directors or officers of various holding companies that were set up in conjunction with the transaction.

In *Scott v. Multi-Amp Corporation*, 386 F.Supp. 44 (D.N.J.1974), relied on heavily by the plaintiff, a group of individuals formed one corporation to acquire the assets of a second corporation. Among that group were the second corporation's Chairman and Chief Executive Officer, its President, and its Vice-President for Finance. An attorney who served as a director of the second corporation, and whose law firm was general counsel for that corporation, also served as a director and corporate officer of several companies that were controlled by the Chairman of the second corporation. Since the Chairman was in the position of attempting to acquire his own corporation, he was, in essence, on both sides of the transaction. The attorney was therefore in the position of being closely connected with a key party on both sides of the transaction while his law firm was counsel to the corporation that the Chairman and his group were attempting to acquire. The court held that the relationships involving the attorney, his firm, and the various companies should have been disclosed in the proxy. *Id.* at 55–56.

The fact pattern in the instant case differs significantly from that in *Kas* or *Multi-Amp*. First, notwithstanding the plaintiff's assertion to the contrary, it is clear to the court that Dyer and his firm played no part in negotiating the merger. What they did do was prepare the legal documentation for the merger. Joseph Stack negotiated the terms of the merger on behalf of Chenango. Proxy at 3.

Second, unlike in *Kas* and *Multi-Amp*, where the attorneys sat as active board members or officers of the companies in question, Dyer and other Levene, Gouldin attorneys played a very limited role as directors of some Koffman companies just until the times of the first shareholder meetings. Third, and most importantly, the Dyer and Levene, Gouldin representation of the Koffmans or any of their companies bore no relationship whatsoever to the GAI–Chenango merger. Certainly, disqualification would not have been required in this case. *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746 (2d Cir.1981). The failure to disclose the relationship between Levene, Gouldin and the Koffmans was not a material omission. *Beebe v. Pacific Realty Trust*, 578 F.Supp. 1128, 1145 (D.Or. 1984).

### (C) *Lancaster Towers*

■ Lancaster Towers is a federally subsidized housing project that Chenango has owned and operated since 1974. It was discussed in two sections of the proxy. On page 47, the shareholders were provided with a basic description of the project and told that Chenango had written down its investment in the property to zero and that the project had been operating at a loss since the time of its acquisition by Chenango. Reference was then made to more detailed information about Lancaster Towers contained in Chenango's financial statements. Those statements, on pages F–35 through F–38 of the proxy, provided financial information about the project using the equity method of accounting. A balance sheet was also provided.

The plaintiff argues that the proxy was materially misleading in its treatment of Lancaster Towers, because in March of 1979, Joseph Stack stated in an application to the Broome County Industrial Development Authority that the property had a worth of over $1,000,000. The plaintiff maintains that information setting forth the "true value" of Lancaster Towers should have been in the proxy.

It became clear to the court during the course of the trial that Joseph Stack was somewhat "aggressive" in the preparation of the IDA application mentioned above. He is not an expert in valuation, and he did want to paint a picture of his company in the best light possible. The court cannot conclude that Stack's estimate was sufficiently accurate that it should have been included in the proxy. The shareholders were provided with detailed information on the financial condition of the project from which they could draw their own conclusions. Stack's unsubstantiated opinion as to the project's "true value" would have hindered Chenango's shareholders more than helped them. Under these circumstances, the court cannot hold that the omission of Stack's estimate of the value of Lancaster Towers was material. *See Flynn v. Bass Brothers Enterprises, Inc.,* 744 F.2d 978, 988 (3d Cir.1984); *Starkman v. Marathon Oil Co.,* 772 F.2d 231, 239–42 (6th Cir.1985); *South Coast Services Corporation v. Santa Ana Valley Irrigation Co.,* 669 F.2d 1265, 1270–73 (9th Cir.1982).[5]

#### (D) *IDA Application*

■ In March of 1979, Stack submitted the IDA application mentioned above to the Broome County Industrial Development Authority for the issuance of $1,800,000 in industrial development bonds. In April of 1979, the Authority approved the application, but the approval was contingent upon the purchase of the bonds by a financial institution. First City Bank of Binghamton agreed to purchase the bonds, but before doing so, the Bank wanted a guarantee from GAI or a GAI subsidiary. Burton Koffman was reluctant to have GAI act as a guarantor because of GAI's own financial condition and its policy against guaranteeing the debts of its subsidiaries. Finally, after Koffman discussed his family's long relationship with the Bank with Bank officials, the Bank consented to allow Chenango II, the post-merger Chenango, to guarantee the bonds. The plaintiff asserts that the defendants' failure to mention in the proxy the IDA application and its approval constituted a material omission.

The court harbors no doubts that IDA approval was contingent on the merger of GAI and Chenango. The court heard no testimony and received no other evidence that would lead it to believe that Chenango would have had access to the $1,800,000 if the merger with GAI had not taken place.

Due to the contingent nature of the Bank's agreement to purchase the bonds, and the dearth of evidence that any other bank would have purchased the bonds without a merger, it would have been misleading for the defendants to have disclosed the IDA application in the proxy. "It is well established that the federal securities laws do not impose a duty to disclose information regarding current or future plans that are uncertain or contingent in nature." *Warner Communications, Inc. v. Murdoch,* 581 F.Supp. 1482, 1491 (D.Del.1984). *See also Susquehanna Corp. v. Pan American Sulphur Co.,* 423 F.2d 1075, 1085–86 (5th Cir.1970); *Todd Shipyards v. Madison Fund, Inc.,* 547 F.Supp. 1383, 1387 (S.D.N.Y.1982). The court therefore holds that it was not a material omission to exclude from the proxy any mention of the IDA application or its subsequent approval.

#### (E) *Economic Forecast*

■ Under a section entitled "Competition and Dependence on General Economic Conditions," the proxy provided as follows:

In periods of decreasing sales Chenango's customers may find it more advantageous to utilize their own plant, equipment and employees rather than contracting out manufacturing requirements

---

5. These cases are not in strict agreement with one another. For instance, *Flynn* adopts a case by case approach while *Starkman* sets down a general rule applying to all uncertain information. Under any of these standards, however, the court holds that the proxy should not have contained Stack's estimate of the value of Lancaster Towers.

to companies like Chenango. Therefore, the company's business is more dependent upon general economic conditions than upon competition from other firms engaged in the same business.

*Id.* at 48. The plaintiff's position is that this paragraph would lead a Chenango shareholder to believe that Chenango would definitely be facing periods of decreasing sales and that its business prospects were not favorable, when in fact, they were quite good.

The court is impelled to hold that the plaintiff's interpretation of the above-cited paragraph is incorrect. In no way does the paragraph portend financial problems for Chenango. The plain language simply states that Chenango's business is influenced by general economic conditions. Certainly, a Chenango shareholder could interpret that to mean that Chenango would prosper when economic conditions were bullish.

Furthermore, the evidence indicates that in the years prior to the merger, Chenango's performance was very cyclical, with six profitable years and four losing years. The court also heard testimony that, when some large corporate customers such as IBM and Digital Equipment Corporation were enduring slack business periods, they manufactured items in-house that had previously been contracted out to Chenango. Thus, the paragraph that is being challenged as misleading does in fact appear to have been an accurate description of Chenango's competition and dependence on economic conditions.

Moreover, the court disagrees with the plaintiff's assertion that economic projections should have been included in the proxy. Such speculation by the defendants would have provided a much stronger basis for a suit such as the instant one than the failure to provide uncertain information. *Flum Partners v. Child World, Inc.,* 557 F.Supp. 492, 499 (S.D.N.Y.1983). *See also Beebe,* 578 F.Supp. at 1141–44; *Rubin v. Long Island Lighting Co.,* 576 F.Supp. 608, 614 (E.D.N.Y.1984). Therefore, the court concludes that there was no material omission or misrepresentation regarding the paragraph dealing with economic conditions or the failure to include economic forecasts.

### (F) *Chenango's Board Recommendation of the Merger*

The proxy stated that Chenango's board had unanimously approved the merger and recommended that the shareholders vote in favor of it. Proxy at iii, 3. The plaintiff contends that board member William Starner did not vote in favor of the merger, and therefore, the proxy contained a material misrepresentation.

A Starner deposition that was read into evidence indicates that Starner did not remember having voted in favor of the merger. The minutes of the board meeting at which the vote on the merger was held, however, do indicate that Starner did in fact vote in favor of the merger. Further, the other Chenango board members who testified during trial stated unequivocally that the vote in favor of the merger had been unanimous. The court is convinced that Starner did vote in favor of the merger and that no material misrepresentation resulted from the proxy's indication that the vote had been unanimous.

The plaintiff also contends that the proxy was misleading because the board's recommendation of the merger was based in part on the market value of Chenango shares. The plaintiff asserts that the board knew that there was no actual market for the shares. At best, this contention sets forth a claim for breach of a fiduciary duty under state law and is not actionable under the federal securities laws. *Data Probe Acquisition Corp.,* 722 F.2d at 4; *Panter v. Marshall Field & Co.,* 646 F.2d 271, 288–89 (7th Cir.1981).

### (G) *Great American Corrugated Container Corporation*

At the time of the merger, Great American Corrugated Container Corporation (GACCC) was a GAI subsidiary. Since the time of its acquisition by GAI in 1976, GACCC had continuously lost money. Proxy at 33. The proxy disclosed that in 1978, GAI's container products operations had losses of $2,459,000 and in 1977 had losses of $741,000. *Id.* at 34, 35. In reference to the Container Products Division of

GAI, the proxy stated in pertinent part that:

> The Company has taken steps to cut costs and improve margins, including price increases and substantial reductions in the work force without corresponding reductions in volume. These steps have reduced losses but have not eliminated them.

*Id.* at 25.

The plaintiff maintains that the proxy should have contained financial information from the first half of 1979 which showed that GACCC had lost $2,100,000. The plaintiff consequently asserts that the representation in the proxy that GACCC had reduced its losses was materially misleading.

The SEC only requires that interim financial data be included for an entire company, not for each of its separate subsidiaries. 17 C.F.R. § 210.10–01(a)(1) provides:

> § 210.10–01 Interim financial statements.
>
> (a) Condensed statements. Interim financial statements shall follow the general form and content of presentation prescribed by the other sections of this Regulation with the following exceptions:
>
> (1) Interim financial statements required by this rule need only be provided as to the registrant and its subsidiaries consolidated and may be unaudited. Separate statements of other entities which may otherwise be required by this regulation may be omitted.

As the SEC did not require that the interim financial data be included in the proxy, the court's only concern is whether the failure to disclose the data was a material omission.

The proxy made quite clear that GACCC had been losing a great deal of money, so the fact that it had lost even more money in the first half of 1979 would have added little, if anything, to what the proxy already contained pertaining to the financial performance of the company. The plaintiff's primary point, though, is that the omission was material in light of the representation in the proxy that GACCC had reduced its losses.

The court heard substantial credible testimony from GAI Vice-President William Fleming that a number of steps were taken to reduce GACCC's losses and that the losses were in fact reduced. In March of 1979, Fleming took control of GACCC and instituted changes that included, among other things, raising prices and decreasing the number of employees. Fleming testified that, during the fourth quarter of 1979, the company actually broke even. Under these circumstances, the court concludes that the omission from the proxy of interim financial data from the first half of 1979 was not material and the statement in the proxy that GACCC had reduced its losses was not misleading.

■ During the summer of 1979, GAI was contacted by a British company called Lin Pac about the possibility of acquiring some or all of GACCC's assets. Martin Buckley, a representative from Lin Pac, visited GACCC's facilities and met with Fleming about an acquisition. According to Fleming, GACCC was not actively pursuing the possibility of acquisition, and he was somewhat surprised by Lin Pac's overtures.

As discussions between Fleming and Buckley continued, Buckley mentioned an acquisition price of $5,000,000. Fleming testified that he did not believe that amount was what Buckley believed GACCC to be worth, but rather, it was just a dollar figure that Lin Pac had set for an acquisition in the United States. Nothing concrete had been decided in the discussions between Fleming and Buckley by the time that the proxy was sent to Chenango shareholders in September of 1979.

In December of 1979, Evan Cornish, Chairman of Lin Pac, came to the United States and met with Burton Koffman. It was at this point that negotiations between Lin Pac and GAI began in earnest. They did not always run smoothly, but by March of 1980, the parties had reached an agreement. Lin Pac would acquire GACCC's fixed assets and inventory for approximately $6,000,000 and would not acquire the company's accounts receivable, which totaled approximately $3,000,000. Thus,

when the transaction officially closed on March 31, 1980, GAI had received total consideration for the GACCC assets of approximately $9,000,000.

The plaintiff argues that information regarding the negotiations with Lin Pac should have been contained in the proxy, even though the acquisition was not finalized until March of 1980. Specifically, the plaintiff's position is that the $5,000,000 figure that was mentioned early in Fleming's discussions with Buckley should have been set forth in the proxy, as that figure was an accurate value of GACCC. GAI's financial statements, which were included in the proxy, listed GACCC's assets at between $12,500,000 and $13,000,000. Such a discrepancy, the plaintiff contends, shows that GAI had grossly overvalued GACCC to the extent that the proxy was materially misleading.

The court finds that the $5,000,000 figure that was mentioned in the discussions between Fleming and Buckley bore no relevance to anything that actually transpired regarding the acquisition. Clearly, that amount was not a limit on what Lin Pac would pay for GACCC, since in the end GAI received almost $4,000,000 more in consideration. The inclusion of the $5,000,000 figure in the proxy would have been misleading; its omission was not.

Further, the fact that GACCC assets were eventually acquired for several million dollars less than the value at which they were listed in the proxy did not render the proxy misleading or inaccurate. The plaintiff relies primarily on the case of *Securities and Exchange Commission v. Bangor Punta Corp.*, 331 F.Supp. 1154 (S.D.N.Y.1971), *modified, Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir.1973). In that case, the court held that a registration statement and prospectus should have disclosed the circumstances surrounding the negotiations for the sale of a company's asset, even though the sale itself did not occur

until months after the documents were issued. The court based its decision on the fact that the valuation of the asset that was contained in the documents was four years old, the method used in its determination was "unique," and that it was four times higher than a willing buyer would pay at the time the documents were issued. The court stated that the valuation was "obsolete to the point of being misleading." 331 F.Supp. at 1161. The court also stated, though, that:

> The present conclusion is not necessarily to be taken as applicable in cases where book carrying figures are in accordance with principles of conventional accounting or where circumstances might otherwise differ from those here.

*Id.* at 1162.

In the instant case, the court cannot conclude that the value of GACCC assets contained in the GAI financial statements was obsolete or computed in any fashion other than in accordance with standard accounting principles. The court is unwilling to expand securities laws to the point that a cause of action can be maintained any time a company divests itself of an asset, subsequent to the issuance of a proxy or a prospectus, at a price less than the value set forth in the proxy or prospectus.

At the time the proxy was issued, the actual negotiations for the acquisition of GACCC had not even begun, and the disclosure of the initial tentative discussions would have been grossly misleading. *See Reiss v. Pan American World Airways*, 711 F.2d 11, 14 (2d Cir.1983); *Staffin v. Greenberg*, 509 F.Supp. 825, 836 (E.D.Pa. 1981), *aff'd*, 672 F.2d 1196 (3d Cir.1982).[6] Therefore, the court concludes that no material omission resulted from the failure to disclose information regarding the discussions between GAI and Lin Pac for the acquisition of GACCC.

---

**6.** Other courts have applied different tests as to when information concerning negotiations should be included in a proxy or prospectus. *See Michaels v. Michaels*, 767 F.2d 1185, 1195 (7th Cir.1985); *Guy v. Duff & Phelps, Inc.*, 628 F.Supp. 252 (N.D.Ill.1985); *Levinson v. Basic,*

786 F.2d 741 (6th Cir.1986). Under no reasonable test can the court conclude that information concerning the initial discussions regarding a Lin Pac acquisition of GACCC assets should have been contained in the proxy.

### (H) *Mincolla Florida Real Estate*

Chenango director Anthony Mincolla served as a trustee of a tract of real estate in Naples, Florida at times pertinent to this action. A restaurant called the Buccaneer Roost was built on the property. Among the investors in this venture were Richard Koffman, Burton Koffman, and the Minack Investment Company, a company whose partners were Mincolla and Joseph Stack. There is no contention by the plaintiff that the Naples venture was in any way connected to the business of GAI or Chenango, but he does contend that the proxy should have disclosed that Stack and the Koffmans were in business together.

In support of his position, the plaintiff relies on the decision in *Kas.* However, as discussed earlier, that case involved a situation where attorneys acting on one side of a transaction were officers or directors of at least one company on the opposite side of the same transaction. Certainly, that is not the situation with which the court is confronted in this case. The court does agree with the holding in *Kas*, that if a special relationship exists between parties on opposite sides of a transaction, the facts of that relationship should be set forth in the proxy to allow the shareholders to view the transaction in proper perspective. 796 F.2d at 513.

The court cannot conclude, though, that the relationship between the Koffmans, Stack, and Mincolla, solely in regard to the Naples venture, was a special relationship of which the Chenango shareholders should have been made aware. As stated, the venture was in no way connected to either GAI or Chenango, and it is difficult, if not impossible, for the court to see how it could lead to the ultimate conclusion that the best interests of Chenango shareholders may have been compromised. The mere fact of a close friendship between parties on opposite sides of a transaction is not, standing alone, a material fact that needs to be included in a proxy. *Johnson v. E.C. Ernst, Inc.,* 618 F.Supp. 156, 164 (D.D.C.1985). The alleged omission must still fall within the constraints established by the Supreme Court in *Northway.* In the instant case, there was no substantial likelihood that a reasonable shareholder would have viewed the fact that the Koffmans, Stack, and Mincolla were in business together in Florida as altering the total mix of information made available regarding the merger.

### (I) *Vision Products*

Before the time of the merger, Chenango had begun importing for sale in the United States a stereomicroscope made by a British company called Vision Products. The proxy made no mention of Vision Products or the microscope, and the plaintiff asserts that this omission was material.

While the Vision Products venture initially looked promising, by mid–1979, it became apparent to Chenango management that it was well on its way to failure. The concept of the stereomicroscope was excellent in theory, but it did not, at least at that time, translate well into practice. The court heard ample testimony about a variety of problems with the microscope, not the least of which was that most of the units shipped from England were defective. Vision Products sales accounted for no more than two percent of Chenango's total sales in 1979.

The SEC requires that a proxy contain information about a company's "principal" products and services. 17 C.F.R. § 229.101(c)(1)(i) requires a company with Chenango's revenue to provide information on any product or service that accounts for at least fifteen percent of the company's total annual revenue. Clearly, then, disclosure of the Vision Products venture was not required under this regulation.

Additionally, 17 C.F.R. § 229.101(c)(1)(ii) states in relevant part that documents filed with the SEC must include:

A description of the status of a product or segment ... if there has been a public announcement of, or if the registrant otherwise has made public information about, a new product or industry segment that would require the investment of a material amount of the assets of the registrant or that otherwise is material.

The defendants assert that Vision Products was not a new segment of Chenango's business and the stereomicroscope was not a new product. Their assertion is premised on the fact that, at the time the proxy was issued, the Vision Products venture had been ongoing for quite some time. The court agrees with the defendants in this regard and further holds that, even if Vision Products or the microscope could have been considered "new," neither required the investment of a material amount of Chenango's assets nor was material in any other way. After hearing the evidence, the court is convinced that the Vision Products venture was an insignificant part of Chenango's business and was declining in importance continually by the time the proxy was issued. Under these circumstances, the court holds that the omission of the venture from the proxy was not material.[7]

### (J) Minack Lease

 Chenango had a three-year lease agreement with the Minack Investment Company for its main building in Vestal, New York. Under the terms of the lease, Chenango had a two-year renewal option and a purchase option that could be exercised during the renewal option period. The details of the lease agreement were set forth in the proxy. *Id.* at 51.

In October of 1979, the Chenango Board agreed to an amendment of the Minack lease that made the purchase option exercisable at any time. This action served to facilitate Chenango's IDA application, as Stack testified that the Broome County Industrial Development Authority would require Chenango to own its property if it was to proceed with the bond issuance. Even though the agreement to amend the lease did not occur until after the proxy was sent to Chenango shareholders, the plaintiff argues that it was sufficiently important that the shareholders should have been notified of the action.

The plaintiff's argument is apparently premised on the belief that the agreement

to amend the lease was a proposed transaction with management that should have been disclosed in the proxy under SEC regulations. *See* 17 C.F.R. § 240.14a–101, Item 6. However, the proxy already made clear the arrangement between Chenango and Minack, including the fact that Chenango had an option to purchase the property. The court cannot conclude that a change in the option arrangement whereby Chenango could exercise the option sooner was an additional transaction with management that needed to be disclosed in the proxy.

The plaintiff further maintains that the change in the option arrangement should have been disclosed because it tied in directly with the IDA application. As stated earlier, the mere fact of the IDA application, or even that it was approved, was not material information that should have been included in the proxy when it was very uncertain at the time of the proxy's issuance whether Chenango would actually benefit from the application's approval. It is impossible for the court to see how the change in the lease agreement to allow Chenango to purchase the property sooner would have had any relevance to the question of whether the merger with GAI was beneficial to Chenango. Under the *Northway* standard, the omission of the change in the lease agreement was not material, and a supplemental mailing need not have been sent to Chenango shareholders.

### (K) Tax Consequences of the Merger

 The plaintiff argues that the proxy was misleading in its treatment of what type of shareholder approval was necessary before the merger could be consummated. The proxy stated that, "The affirmative vote of the holders of two-thirds of the issued and outstanding shares of Chenango Stock is required for adoption of the Merger Agreement." *Id.* at 2. The proxy also stated that, "[H]olders of more than two-thirds of the issued and outstanding Shares of Chenango have indicated an

7. The court notes that the plaintiff testified quite clearly at trial that he was familiar with the Vision Products venture long before the proxy was issued. He read several press releases that Chenango issued, and he actually examined the

stereomicroscope. Generally, there is no duty to disclose information to one who should already be aware of it. *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978).

intention to vote in favor of the Merger." *Id.* at 3.

Stack testified that he very much wanted the merger to be tax free for his shareholders. The merger was made contingent upon Chenango receiving an opinion from the accounting firm of Coopers & Lybrand that the exchange of stock would be tax free for the shareholders. Such an opinion was received, but it was made contingent upon eighty-five percent of the total value of Chenango's outstanding shares being exchanged for GAI Series B preferred stock. These details were discussed in the proxy. *Id.* at 8–10.

The plaintiff's point is that the shareholders were led to believe that their votes were meaningless, because they were informed that a two-thirds majority was all that was necessary to approve the merger and that holders of more than two-thirds of Chenango's shares had already committed themselves to the merger. The plaintiff asserts that, in actuality, the merger would not have taken place unless holders of at least eighty-five percent of Chenango's shares voted in favor of the merger.

The plaintiff's point is not well taken. The merger was contingent upon the receipt of the opinion from Coopers & Lybrand, which Chenango did receive, and was not dependent upon the holders of eighty-five percent of Chenango's shares actually committing themselves to vote for the merger. The proxy misrepresented nothing in this regard. Stack did testify that, while he wanted the merger to be tax free, it did not have to be in order to occur. The key was the receipt of the opinion from Coopers & Lybrand, and once Stack received it, he was committed to the merger, regardless of the ultimate tax consequences.

The plaintiff also asserts that many of the Chenango shareholders would not have benefited from a tax-free exchange. The proxy made quite clear that the tax consequences of the merger would vary as to particular shareholders. *Id.* at 9. Chenango was not required to set forth the tax consequences for each individual shareholder. *Mendell v. Greenberg*, 612 F.Supp. 1543, 1553–54 n. 13 (S.D.N.Y.1985); *Lewis v. Oppenheimer*, 481 F.Supp. 1199, 1205–06 (S.D.N.Y.1979). The court holds that there was no material misrepresentation in the proxy regarding the vote required to approve the merger or the tax consequences of the merger for the shareholders.

### (L) *Centuri, Inc.*

Centuri, Inc. is a company that manufactures, among other amusement games, pinball machines. In June of 1979, when Centuri was known as Allied Leisure Industries, Inc., the Koffmans purchased a controlling interest in the company. Centuri is not, and never has been, a subsidiary of GAI. The plaintiff's position is that the proxy should have disclosed the Koffmans' involvement with Centuri because it was a motivating factor in GAI's merger with Chenango. The plaintiff's argument is that Centuri, which uses printed circuit boards in its products, would greatly benefit from the merger because it would have a ready source of circuit boards at, presumably, favorable prices. The plaintiff further argues that Centuri would benefit from the expertise of Chenango's management.

Even if Centuri were a subsidiary of GAI, the court could not conclude that its acquisition by the Koffmans was relevant to the GAI–Chenango merger. Whether there was a merger or not, Centuri could have purchased circuit boards from Chenango, and its management could have sought advice from Chenango's management about how to improve operations.

As it turns out, the court heard testimony that the merger of GAI and Chenango did not provide any financial benefit to Centuri. In fact, under the terms of licensing agreements to which it was a party, Centuri was obligated to purchase the majority of its circuit boards from overseas sources. The court does note that, after the merger, Centuri did do business with Chenango II. However, the amount of the business, at one point just under $1,000,-000, was a relatively small percentage of each company's total business, and even without the merger, considering the Koff-

mans' long relationship with Stack, it may still have transpired.

In short, the facts do not bear out that one of the motivating factors behind the merger was the Koffmans' involvement with Centuri. There is nothing in the record that indicates that Centuri received any sort of special treatment from Chenango. Information about the Centuri acquisition by the Koffmans would not have altered the total mix of information made available about the merger of GAI and Chenango.

(M) *Stack Purchases of Chenango Stock*

■ The proxy contained the following description of the trading history of Chenango stock:

> The Chenango Common Stock is traded by a limited number of brokers located within Broome County, New York. The high and low sales prices per share of Chenango Common Stock as reported in the years 1978 and 1977 set forth below, are not reported in any publication but have been obtained through inquiries of brokers who have handled transactions in such stock. Where there were no actual sales within a quarter the highs and lows are reported on the basis of bid and asked prices. For the years 1977 and 1978 the high and lows sales or bid and asked prices were 3-¾ and 3-¼ respectively. During the first 8 months of 1979 there have been only a limited number of purchases and sales. The high and low sales prices per share were 5-½ and 3-¼ respectively. As of September 10, 1979, the bid and asked prices for Chenango Common Stock were 3-⅞ and 4-⅞ respectively.

*Id.* at 14–15. The plaintiff contends that the fact that Joseph Stack purchased Chenango stock during the period set forth above should have been disclosed in the proxy, because Stack somehow manipulated the price of the stock.

The court heard no evidence whatsoever that would lead it to believe that there was any manipulation of the stock price. Gary Davison, a stock broker with the firm of E.F. Hutton, was one of the few brokers in the Binghamton area that followed the trading in Chenango stock. In fact, the trading that did occur was usually through him. Stack and Davison testified that, when Stack wanted to purchase Chenango shares, Davison would inform him of the most recent trading price. Davison strongly refuted any implication by the plaintiff that Stack dictated the price of the stock. When Stack did purchase Chenango stock, it was usually as an accommodation to shareholders who had no other way to sell their shares.

> 'Manipulation' is 'virtually a term of art when used in connection with securities markets.' ... The term refers generally to practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.

*Santa Fe Industries v. Green,* 430 U.S. at 476, 97 S.Ct. at 1302. The court cannot conclude, under the definition set forth above or any other reasonable definition, that "manipulation" occurred in the instant case.

The plaintiff also maintains that, because the SEC requested information about inside trades of Chenango stock, information about the Stack trades should have been included in the proxy. That the SEC requested information on inside trades does not mean that the information was material and needed to be disclosed in the proxy. *See Lewis v. Oppenheimer,* 481 F.Supp. at 1208. The court concludes that the fact that Stack purchased Chenango stock was not material information that should have been disclosed in the proxy.[8]

The court has now addressed all of the plaintiff's allegations regarding deficiencies in the proxy, at least all of the deficiencies that were raised during trial, and concludes that only the *United Rubber* decision was a material omission. The court cannot conclude that there were any material misrepresentations. Moreover, when considering all of the alleged misrepresen-

---

**8.** A strong argument can be made that the plaintiff does not have standing to sue for insider trading. *See Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 94–95, (2d Cir.1981) (addressing claims under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5).

tations and omissions as a whole, the court cannot hold that the point has been reached where:

> [T]he facts disclosed by corporate management, though true, are so devoid of explication or other supporting data that the overall disclosure becomes deceptive, and a claim is stated under the federal securities law.

*Hundahl v. United Benefit Life Insurance Co.*, 465 F.Supp. 1349, 1365 (N.D.Tex. 1979). *See also Anderson v. Boothe*, 103 F.R.D. 430, 438–39 (D.Minn.1984). As much as the plaintiff has argued to the contrary, the court finds no evidence of a master plan on the part of the defendants to cover up or twist the facts of the merger in order to deceive the Chenango shareholders. What the plaintiff has done is assemble a pastiche of allegations that are, in almost all instances, unrelated to one another. Notwithstanding the plaintiff's zealous effort in scrutinizing the proxy with a high power magnifying glass in search of flaws, with the exception of the *United Rubber* decision, the court concludes that the proxy contained none.

■ Having determined that the defendants should have informed the Chenango shareholders of the *United Rubber* decision, the court must next determine whether the failure to do so amounted to negligence. *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d at 1300–01; *Gruss v. Curtis Publishing Co.*, 534 F.2d 1396, 1403 (2d Cir. 1976); *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 776–78 (3d Cir.1976).

William Fleming, who as discussed earlier was involved with corrugated container products at GAI, also testified at length about the steps taken after learning of the adverse decision in the *United Rubber* case. Fleming discussed the decision in great detail with GAI's lawyers and accountants to determine its effect on the company. He performed mathematical calculations to compute the ratio resulting from dividing the dollar amount of the judgment by GAI's assets and annual income. He took careful steps to examine all relevant SEC regulations, and he insured that they were followed. Further, notwithstanding that Rubatex's recently appointed President was mentioned in the *United Rubber* decision as having been involved in the wrongdoing regarding Linear, Inc., Fleming testified that his overall record at Rubatex had been exemplary. The man's appointment as President of Rubatex occurred some fifteen years after the events that were the subject of the *United Rubber* case.

The court is not deciding here whether the Chenango shareholders should have been informed of the *United Rubber* decision; that question has already been answered in the affirmative. However, it is clear to the court that a number of careful steps were taken before a decision was made not to send a supplemental mailing to Chenango's shareholders informing them of the decision. While in the court's view, the decision not to inform the shareholders was incorrect, the defendants did not act negligently in reaching it. The court is convinced that the defendants acted in good faith, and with great care, in determining the materiality of the *United Rubber* decision. Therefore, the standard for culpability under Section 14(a) and Rule 14a–9 has not been met in this case.

## II.

■ The plaintiff also contends that the defendants, by the issuance of the proxy, violated 15 U.S.C. § 78j(b) (Section 10[b] of the Securities Exchange Act) and 17 C.F.R. § 240.10b–5 (Rule 10b–5), which provide as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

\* \* \* \* \* \*

§ 240.10b–5 Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

A violation of this statute and accompanying regulation requires a showing that: (1) the proxy contains a material misrepresentation or omission; (2) a causal relationship exists between the alleged violation and injury; and (3) the defendant or defendants acted with scienter. *Reingold v. Deloitte Haskins & Sells,* 599 F.Supp. 1241, 1261 (S.D.N.Y.1984). The court only needs to address the first and third elements set forth above in order to resolve this issue.

■ Given that the only material misrepresentation or omission that the court has found involves the failure to notify the Chenango shareholders of the *United Rubber* decision, the plaintiff must show that the defendants acted with scienter. Scienter has been defined as the intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976). The Second Circuit has held that, at least in certain situations, recklessness can constitute scienter. *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 46 (2d Cir.1978).

The court has already concluded, however, that the defendants were not even negligent, and negligence itself would not satisfy the scienter requirement. *Ernst & Ernst v. Hochfelder,* 425 U.S. at 201, 96 S.Ct. at 1385; *Zuckerman v. Harnischfeger Corp.,* 591 F.Supp. 112, 116 (S.D.N.Y.

1984); *Pryor v. United States Steel Corp.,* 591 F.Supp. 942, 956 (S.D.N.Y.1984), *modified,* 794 F.2d 52 (2d Cir.1986); *McLean v. Alexander,* 599 F.2d 1190, 1198 (3d Cir. 1979).

Therefore, because the defendants did not act with scienter, the court finds no merit to the plaintiff's claim based on alleged violations of Section 10(b) and Rule 10b–5.

### III.

The third statute with which the court must concern itself is 15 U.S.C. § 77*l* (Section 12(2) of the Securities Act of 1933). That statute provides:

Any person who—

(1) offers or sells a security in violation of section 77e of this title, or

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

■ A violation of Section 12(2) is established if a plaintiff shows that: (1) the proxy contains a material misrepresentation or omission; (2) he or she did not know of the untruth or the omission; and (3) the

defendant or defendants knew or in the exercise of reasonable care could have known of the misrepresentation or omission. *Cook v. Avien, Inc.*, 573 F.2d 685, 693 (1st Cir.1978). Again, the court need only address the first and third elements in order to resolve this issue, although it is constrained to note that at least as to some of the allegations, the plaintiff does not meet the second element. For instance, as discussed earlier, the proxy made no mention of the Vision Products venture, an omission that the court has already found immaterial. However, the plaintiff was well aware of the stereomicroscope, having actually seen it at a shareholders meeting and read about it in the newspaper.

 The defendants can avoid liability under Section 12(2) if they show that they acted with reasonable care. *Franklin Savings Bank of New York v. Levy*, 551 F.2d 521, 526 (2d Cir.1977); *Sanders v. John Nuveen & Co.*, 619 F.2d 1222, 1227–28 (7th Cir.1980); *Junker v. Crory*, 650 F.2d 1349, 1361 (5th Cir.1981). The court has already addressed the steps taken by the defendants after learning of the *United Rubber* decision and concluded that they acted with reasonable care and with good faith. The plaintiff has therefore failed to establish a violation of Section 12(2).

### IV.

 Finally, the plaintiff has alleged that the defendants violated 15 U.S.C. § 78r(a) (Section 18[a] of the Securities Exchange Act of 1934). In order to establish a violation of this statute, a plaintiff must show that: (1) the proxy contains a material misrepresentation or omission; (2) the plaintiff relied on the misrepresentation or omission; and (3) the defendant or defendants did not act in good faith and had knowledge that the misrepresentation or omission was false or misleading. *Id.;*

*Wachovia Bank & Trust v. National Student Marketing*, 650 F.2d 342, 357 (D.C. Cir.1980).

 Again, the court has already found that the defendants acted reasonably and in good faith in deciding how to deal with the *United Rubber* decision. Further, there is no evidence that would lead the court to conclude that the defendants knew that their failure to notify the Chenango shareholders was misleading. If anything, the steps taken by the defendants show that they were quite concerned that the shareholders should not be misled. The court holds that no violation of Section 18 occurred in this case.[9]

### V.

Because the court has concluded that none of the securities statutes addressed above were violated by the defendants, the plaintiff and the class that he represents are entitled to no damages. However, because the court heard substantial testimony on the question of damages, it will briefly address it here.

 When a violation of the Securities Exchange Act of 1934 has occurred, in most instances, a plaintiff is entitled to receive the difference between what he or she did receive and the fair value of what he or she would have received in the absence of the violation. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972). The same measure of damages applies when dealing with violations of Section 12(2) of the Securities Act of 1933. *Fershtman v. Schetman*, 450 F.2d 1357, 1361 (2d Cir.1971); *Scheve v. Clark*, 596 F.Supp. 592, 596 (E.D.Mo.1984). The crucial determination in the instant case is whether the Chenango shareholders received a fair price for their company in the merger with GAI.[10]

---

9. While it is unnecessary to address the question of reliance here, the court has serious doubts that the plaintiff proved actual reliance on the document by himself and by the class members. *Ross v. A.H. Robbins Co.*, 607 F.2d 545, 552 (2d Cir.1979).

10. The plaintiff has also argued that if the merger was unlawful, he and the class members would be entitled to recover the profits earned

by Chenango II for a reasonable period of time after the merger. *See Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.1965). Even had a violation occurred in this case that would entitle the plaintiff and the class members to damages, the court is not convinced that they would be entitled to *Janigan*-type damages. *See Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1303–06 (2d Cir.1973).

Two experts testified on behalf of the plaintiff on the question of damages. Norman Turner was President of a company called Magnetic Laboratories, Inc. (Magnetic Labs), which he sold in 1979 to the Savin Corporation. The gist of his testimony was that Magnetic Labs and Chenango were very similar companies, and he thus had a good basis to determine the value of Chenango. Not surprisingly, Turner's valuation of Chenango was far higher than its acquisition price by GAI. The court gives little, if any, credence to the testimony of Turner for the reason that Magnetic Labs was a much different company than Chenango. Joseph Stack testified at length about the many areas with which Magnetic Labs was involved. Chenango has only been involved with a small fraction of those areas by comparison. The court is not satisfied that Turner is well familiar with Chenango and concludes that his own experiences with Magnetic Labs are irrelevant to the question of placing a value on Chenango.

The plaintiff's second expert was Ronald Quintero, who is now an Associate at the Wall Street investment firm of Bear, Stearns & Co., Inc. Quintero was the plaintiff's key expert, and he testified in great detail about the formula he used in placing a value on Chenango. Primarily, Quintero used what is known as the "discounted cash flow" analysis, and he prepared a lengthy written report that supplemented his in-court testimony. The end result of Quintero's computations was that Chenango was worth approximately $6,000,000 at the time of the merger with GAI.

The defendants also presented two experts on the question of damages. Their first expert was Gilbert Matthews, a Managing Director of Bear, Stearns.[11] Matthews has been Chairman of the firm's Valuation Committee for seventeen years and is responsible for evaluating and signing every fairness opinion that the firm issues. While he was not asked to give a fairness opinion in this case, he did testify as to proper methodologies to be used in determining fairness.[12] Matthews stated unequivocally that the "discounted cash flow" analysis is rarely used in the securities field and is almost never used at Bear, Stearns. Among the reasons that Matthews cited was that the figures in the "discounted cash flow" analysis could be juggled to arrive at almost any result desired. Matthews also testified as to at least several flaws in Quintero's analysis. For instance, Quintero mistreated figures regarding Lancaster Towers, applying them on one side of his equations but not compensating for them on the other. Further, in applying his analysis, Quintero used an arbitrary multiple taken from a study by the accounting firm of Peat, Marwick & Mitchell that he believed was applicable to companies like Chenango. Matthews had research done on the companies utilized by Peat, Marwick in arriving at its multiple, and he determined that almost none of them was even remotely similar to Chenango and that the multiple was inapplicable to a company such as Chenango. The court found Matthews to be a highly credible witness and concludes that he established sufficient flaws in Quintero's analysis so that it should be given little, if any, weight.

The defendants' second expert was Bernard Dorshow. He testified about three different methodologies that he utilized in arriving at a value for Chenango. He averaged the results that he reached from the three methodologies to determine what he believed was an accurate value for Chenango's shares at the time of the merger, approximately $4.00 per share. As stated early on, $4.00 per share was the book value of Chenango stock at the time of the merger. Dorshow also did a careful study of GAI, something which the court is not convinced that Quintero did, and he deter-

---

**11.** It is strictly coincidence that each side called an expert from the same investment firm. Quintero began working at Bear, Stearns only recently, and well after he was retained by the plaintiff, while Matthews has worked at the firm for years.

**12.** The court gives no credence to the plaintiff's argument that Matthews's failure to give a fairness opinion of the merger in the instant case should create an inference that the merger was unfair.

**1578**

mined that the value of the GAI Series B preferred stock received by the Chenango shareholders was actually somewhat higher than the value of the Chenango stock that was converted.

The plaintiff failed to establish any flaws in Dorshow's methodology that would give the court doubts about its validity. The court is therefore convinced that the method used by Dorshow in determining a fair value for Chenango is more accurate, and thus, more reliable than that used by Quintero. In sum, the court finds that the defendants' experts were more credible than those of the plaintiff and concludes that, even if a securities law violation had occurred, the plaintiff and the class members would have suffered no damages because of it.

Accordingly, for the reasons adduced in this opinion, judgment is hereby granted in favor of the defendants.

IT IS SO ORDERED.