Alexander WILSON, Individually and as representative of all minority shareholders of Chenango Industries, Inc., other than defendants on and before October 18, 1979, Plaintiff–Appellant,

v.

GREAT AMERICAN INDUSTRIES, INC., as a corporate entity and as a sole shareholder of Chenango Industries, Inc., Milton Koffman, Burton I. Koffman, Richard E. Koffman, as directors of Great American Industries, Inc., Chenango Industries, Inc., Joseph M. Stack as the representative of Chenango Industries in the merger between Chenango and Great American Industries, and Gary Crounse, David Keith Dyer and Sharon Lee Dyer, as Co-Executors of the Estate of David L. Dyer, Deceased, William Starner, and Anthony Mincolla as directors of Chenango Industries, Inc., Defendants–Appellees.

No. 701, Docket 87–7576.

United States Court of Appeals, Second Circuit.

Argued Feb. 11, 1988.

Decided Aug. 29, 1988.

William E. Hegarty, New York City (Cahill Gordon & Reindel, New York City, Charles A. Gilman; Coughlin & Gerhart, Binghamton, N.Y., Peter H. Bouman, Richard W. Mertens, of counsel), for plaintiff-appellant.

John S. Guttman, Washington, D.C. (Beveridge & Diamond, P.C., Washington, D.C., Dean H. Cannon; Hancock & Estabrook, Syracuse, N.Y., Donald J. Kemple, of counsel), for defendants-appellees.

Before LUMBARD and
CARDAMONE, Circuit Judges, and
LEISURE, District Judge.*

LUMBARD, Circuit Judge:

Plaintiffs, former minority shareholders of Chenango Industries, Inc., brought suit in the Northern District against Great American Industries, Inc. (GAI), Chenango, and various officers and directors of those corporations challenging the legality of a joint proxy/prospectus issued by GAI and Chenango in connection with Chenango's 1979 merger into GAI. The plaintiffs alleged that the proxy statement misrepresented and failed to disclose material facts regarding the financial condition of GAI and Chenango, and the integrity of, and the relationships between, the officers and directors of the two companies.

Following a non-jury trial, Judge McCurn granted judgment in favor of defendants, finding that all but one of the alleged omissions or misrepresentations were not material, and that the defendants did not act with the requisite culpability to be liable for the one material omission. *Wilson v. Great American Industries*, 661 F.Supp. 1555, 1573–74 (N.D.N.Y.1987). The court also determined that even if a securities law violation had occurred, the plaintiffs suffered no damages. *Id.* at 1576–78.

We find that the omissions from and misrepresentations in the proxy statement were material and were in violation of the securities laws. We also disagree with the district court's conclusion that the plaintiffs have suffered no damages. Accordingly, we reverse and remand for further proceedings to assess damages.

I.

The facts are not in dispute. In such a case, we are in as good a position as the district court to draw inferences and conclusions from the facts. *In re Hygrade Envelope Corp.*, 366 F.2d 584, 588 (2d Cir. 1966).

GAI is a Delaware corporation based in Binghamton, New York. In 1979, its common stock was publicly held and traded on the American Stock Exchange. At that time, GAI's principal products were rubber goods, corrugated boxes and various recreational products, all of which were manufactured and/or marketed through subsidiaries.

At relevant times, Burton Koffman was President of GAI and Chairman of its board of directors. His brother, Richard Koffman, was a GAI board member as well. Their uncle, Milton Koffman, was Treasurer and Secretary of GAI and a member of its board of directors. He also served as a director of Chenango. The Koffmans owned approximately 28% of the common stock of GAI and 28% of the common stock of Chenango. They have since taken GAI private, purchasing all of its outstanding common stock in 1985.

Before its merger into GAI, Chenango was a New York corporation based in the Binghamton area. The company was founded in 1967 by Joseph Stack, and its shares were traded over the counter. Chenango is an assembly and service company, supplying manufacturing services to electronic equipment manufacturers who subcontract all or part of their manufacturing needs. Most of its business comes from large corporate customers; at the time of the merger, IBM accounted for almost one-half of Chenango's sales. In addition, Chenango owns and operates Lancaster Towers, a federally subsidized housing project

---

* The Honorable Peter K. Leisure, United States District Judge for the Southern District of New York, sitting by designation.

for the elderly near Buffalo, New York from which it derives substantial tax benefits. After becoming a wholly-owned subsidiary of GAI, Chenango remained intact and autonomous.

At the time of the merger, Stack was President, Chairman of the Board and the controlling shareholder of Chenango. Gary Crounse, William Starner, Anthony Mincolla, Milton Koffman, and the late David Dyer were the remaining directors and they are all defendants here, Dyer through the executors of his estate. Crounse was Vice–President and General Manager of Chenango and Starner was its Sales Manager. Dyer, a partner in the Binghamton law firm of Levene, Gouldin and Thompson, was Secretary of, and General Counsel to, Chenango. Dyer and his firm also represented the Koffmans and some of the interests they controlled other than GAI.

The defendants began to plan the merger in 1978. Stack testified that in order for Chenango to grow, it needed to become part of a larger company with greater resources. Stack had known the Koffmans for many years both in business and socially. Milton Koffman was a director of Chenango and GAI. Richard and Burton Koffman had invested in a Florida real estate venture with Stack and Mincolla, another Chenango director. Stack and Mincolla were lifetime friends of the Koffmans.

On January 30, 1979, the GAI board decided that the company would benefit from a merger. Without the aid of an outside appraisal of Chenango, Stack and William Lyons, a GAI director, negotiated the final terms of the merger. In June 1979, the boards of GAI and Chenango approved the merger and prepared a proxy statement for Chenango's minority shareholders.

Meanwhile, Stack was expanding Chenango's operations. In March 1979, Stack submitted on behalf of Chenango an application to the Broome County Industrial Development Authority (IDA) for the issuance of $1.8 million in industrial development bonds. The application made no mention of the proposed merger. One month later, the Authority approved the application.

For the loan transaction to be completed, Chenango only needed to procure a purchaser of the bonds. On August 14, 1979, a Binghamton bank agreed to purchase the bonds, and asked GAI, the proposed sole shareholder of Chenango, to provide a guarantee. GAI did not immediately respond to the bank's request. On August 15, 1979, Chenango received state approval for acquisition of state land for the proposed industrial development.

During the same time period, GAI's directors were voicing concern at board meetings over the performance of Great American Corrugated Container Corporation (GACCC), a subsidiary. In the first six months of 1979 GACCC suffered losses totalling $2.1 million, after having lost $2.5 million the previous year.

GAI's directors had also been awaiting a decision in a pending lawsuit brought by a union of a GAI subsidiary against GAI and two other subsidiaries to recover benefits that the employees believed they were owed. On September 20, 1979, Judge Duffy of the Southern District issued a decision in the case of *United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO v. Great American Industries, Inc.*, 479 F.Supp. 216 (S.D.N.Y.1979), finding GAI liable for "systematically stripping" the assets of the subsidiary in order to avoid paying union obligations. The final damage award was just under $990,000.

The defendants sent the proxy statement to Chenango's shareholders on September 27, 1979. The terms of the merger can be summarized as follows: The aggregate book value of Chenango's common stock was $1.2 million or $4 per share. In exchange for the Chenango common stock, GAI issued a new Series B preferred stock with the aggregate par value of $1.2 million, bearing a 6% dividend and convertible into GAI common stock at the rate of 6 shares of Series B to 5 shares of common. On October 18, 1979, Chenango's shareholders approved the merger and on October 31, 1979, Chenango became a wholly-owned subsidiary of GAI. The dissenters accepted cash settlements.

Alexander Wilson commenced this class action on October 17, 1980 on behalf of himself and other minority shareholders of Chenango. The plaintiffs claim that their sale of Chenango stock and purchase of GAI stock in the merger was caused by a materially false and misleading proxy statement. The proxy is alleged to be deficient in five ways: (1) it did not disclose Judge Duffy's decision in the *United Rubber* case; (2) it did not reveal that the $1.8 million IDA loan had been applied for and approved; (3) it did not disclose that Chenango's counsel, David Dyer, and his firm had performed legal services for the Koffmans and their companies; (4) it did not adequately represent the value of Lancaster Towers, a Chenango asset; and (5) it did not adequately represent the value of GACCC, a GAI subsidiary. The plaintiffs allege violations of sections 10(b), 14(a) and 18(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), 78n(a) and 78r(a), as implemented by Rules 10b–5 and 14a–9, 17 C.F.R. §§ 240.10b–5 and 14a–9.

Judge McCurn certified the class in 1982, 94 F.R.D. 570 (N.D.N.Y.1982), and denied cross-motions for summary judgment in 1986, [1986–1987] CCH Fed.Sec.L.Rep. ¶ 92,890. Following a non-jury trial, the district court, on June 12, 1987, granted judgment in favor of defendants. 661 F.Supp. 1555. The court found that the defendants' failure to disclose the *United Rubber* decision was a material omission, but refused to find liability, because the defendants did not act negligently in deciding not to disclose. The court found the remaining 12 alleged misrepresentations or omissions, four of which are pursued on this appeal, not to be material. In addition, the court found that even if a violation had occurred, the plaintiffs did not suffer any resulting damages.

## II.

■ We agree with the plaintiffs that the five omissions and misrepresentations of which they now complain rendered the proxy statement materially misleading. The defendants deliberately withheld important information from Chenango's minority shareholders in violation of § 14(a) of the Act, which provides in relevant part:

It shall be unlawful for any person, ... in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit ... any proxy....

Pursuant to the authority granted in § 14(a), the SEC has promulgated Rule 14a–9, which provides:

No solicitation ... shall be made by means of any proxy statement ... containing any statement which, at the time and in light of the circumstances under which it was made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading....

■ For an omitted fact to be material under Rule 14a–9, there must be a substantial likelihood that a reasonable shareholder would have considered the fact important in deciding how to vote. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The issue of materiality is a mixed question of law and fact, *id.* at 450, 96 S.Ct. at 2133, reviewable by the Court of Appeals. *GAF Corp. v. Heyman*, 724 F.2d 727, 738 (2d Cir.1983) (citing *Kennecott Copper Corp. v. Curtiss–Wright Corp.*, 584 F.2d 1195, 1200 n. 3 (2d Cir.1978)).

a. *The United Rubber decision.*

We agree with the district court's determination that the failure to disclose the *United Rubber* decision was a material omission. *United Rubber* involved a GAI subsidiary called Linear, Inc. that was experiencing severe financial difficulties in the 1960's. GAI and Rubatex, Inc., a successful subsidiary, pumped funds into Linear in an effort to revive it, but Linear continued to struggle. When Linear was unable to meet its obligations under a collective bargaining agreement to a number of its employees, the employees' union sued Linear, GAI and Rubatex to recover bene-

fits that the employees believed they were owed.

The court pierced the corporate veil and found that GAI and Rubatex had engaged in a scheme to strip Linear of its assets so that Linear could meet its obligations to GAI and Rubatex and avoid paying union obligations. Judge Duffy found the conduct of GAI and Rubatex to be "riddled with bad faith and overreaching." 479 F.Supp. at 245. Douglas Garrett, the Treasurer of Rubatex, was found to have fraudulently tampered with an appraisal of Linear's assets. 479 F.Supp. at 241. The court awarded damages of $183,592 as well as pension claims, the amount of which was later computed to be just under $990,000. During the pendency of the appeal, the parties settled for $850,000. In August 1979, Douglas Garrett was appointed President of Rubatex.

Judge Duffy's decision is dated September 20, 1979. Even accepting the district court's finding that the GAI board did not learn of the decision until October 5, 1979, there was ample time to alert the shareholders to the decision in advance of the October 18, 1979 shareholders meeting. There were only 259 minority stockholders, nearly all residing locally in Broome County. As it was, the shareholders voted on the merger based on the proxy statement that described the *United Rubber* litigation and stated that "no decision has yet been rendered by the court." The statement concluded that in the opinion of counsel "there is no basis for any recovery from GAI."

The outcome of the *United Rubber* litigation and Judge Duffy's characterization of the fraudulent acts of GAI's management were significant developments of which the Chenango stockholders should have been informed immediately, especially as the proxy statement contained counsel's opinion that there was no basis for any recovery. The liability for substantial damages was indeed a matter of consequence; moreover, Judge Duffy's exposure of the methods used by those in control of the company's affairs would have caused a minority stockholder to examine the entire statement more carefully. We do not agree with the district court that the failure to send out information regarding the *United Rubber* opinion was not negligent; it was a deliberate decision which necessarily colors the consideration of the other alleged misrepresentations.

b.  *The IDA Financing*

The plaintiffs argue that the proxy statement should have disclosed Chenango's substantial expansion plans, which were made possible by the IDA's approval of an industrial bond financing. The $1.8 million loan, which was not formally completed until after the merger, allowed Chenango to construct an additional plant, renovate its existing facility, and purchase new equipment. Chenango had purchased $164,000 of equipment and received state approval for the acquisition of state land before the proxy statement was mailed.

We disagree with the finding of the district court that the financing was contingent on the merger and thus did not have to be disclosed. It is clear that some facts are deemed material even though they refer to a prospective and, therefore, contingent event provided there appears to be a reasonable likelihood of its future occurrence. *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir.1973). In *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc), *cert. denied sub nom. Kline v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), we formulated the standard of materiality to be applied in such cases:

> [M]aterial facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities. In each case, then, whether facts are material ... will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.

A loan of $1.8 million to a company with a book value of $1.2 million is of unquestionable magnitude "in light of the totality of the company activity." *Id.* Prior to 1979, Chenango had never borrowed as much as $1.8 million for any purpose.

As the defendants expected, the financing brought fruitful results for Chenango in the early 1980's. By 1984, Chenango's sales had doubled, its earnings had tripled and the book value of its stock had more than quintupled. The defendants' own expert witness attested to the role of the IDA loan in Chenango's success. In his valuation report of Chenango, H. Bernard Dorshow wrote:

> An important factor contributing to earnings subsequent to the merger was the expansion of the company's facilities via a $1.8 million IDA loan. Chenango's management characterizes itself as very conservative, but the $1.8 million loan on an equity base of only $1.2 million was a very aggressive move which increased the company's leverage and risk enormously.

At the time the proxy statement was mailed, there was a great probability that the loan would be completed. The IDA had long since given its approval, and a Binghamton bank had already agreed to purchase the bonds. Only the bank's as yet unanswered request that GAI provide a guarantee was needed in order to complete the loan arrangements before the proxy statement was mailed. GAI provided the equivalent of a guarantee after the merger when Burton Koffman called the bank and convinced a bank official to dispense with the requirement of a formal guarantee in light of the Koffmans' longstanding relationship with the bank.

This alleged contingency could just as easily have been resolved before the proxy statement was mailed. Stack received the bank commitment letter on August 15, 1979, and the proxy statement was not mailed until September 27, 1979. The six weeks in between provided ample time for the GAI and Chenango directors to act on the bank's request for a guarantee.

Nor was there any need for the GAI directors to wait until Chenango's minority shareholders voted before making a decision on the loan guarantee. The minority shareholders could not have prevented the merger. Stack and the Koffmans owned 73% of Chenango stock, more than the required two-thirds vote necessary to effectuate the merger. The circumstances being the same before and after the proxy statement was mailed, and with ample opportunity existing to resolve the alleged contingency before the minority shareholders were asked to vote, the corporate actors here should not have "the power to render facts—objectively material facts under the standard of *Northway*—immaterial as a matter of law" by refusing to resolve the alleged contingency. *Kronfeld v. Trans World Airlines*, 832 F.2d 726, 735 (2d Cir. 1987). Chenango's minority shareholders should have been informed of this substantial development.

#### c. *Conflicts of interest*

The plaintiffs next challenge certain undisclosed conflicts of interest of Chenango's directors. They especially object to the nondisclosure of a business relationship between the late David Dyer and the Koffmans. Dyer was a Chenango shareholder, a director and its Secretary and General Counsel. The proxy statement did not disclose that he represented Richard, Burton and Milton Koffman personally and that he and his firm represented more than one dozen entities controlled by the Koffmans. Dyer's firm had represented Koffman-controlled companies since 1933.

The district court recognized that "a failure to disclose a relationship between interested parties that might assume significance in the deliberations of a reasonable shareholder is within the province of the federal securities laws," and that disclosure of such various interests, "will give notice to a shareholder to examine the proposed transaction more critically." 661 F.Supp. at 1564–65. The court excused the omission because it found that Dyer had played no role in the merger negotiations and his firm's representation of the Koffman interests was occasional rather than

ongoing, was limited in scope and was not related to the merger.

The relevant inquiry is not whether an actual conflict of interest existed, but rather whether full disclosure of potential conflicts of interest has been made. *Kas v. Financial General Bankshares,* 796 F.2d 508, 513 (D.C.Cir.1986). The omission proven here deprived the Chenango shareholders of the opportunity to judge for themselves what significance to attribute to Dyer's representation of the Koffmans. The description of Dyer's law firm in the proxy statement as "having represented Chenango in connection with the Merger" necessarily implied that Dyer and his firm were acting with complete loyalty to Chenango and its shareholders and without conflicting interests that might, or might be perceived to, affect their judgment and their advocacy on Chenango's behalf. Considering his status as the shareholders' counsel and as a director recommending the merger, Dyer's long-standing business relationship with the Koffmans should have been disclosed. *See Data Probe Acquisition Corp. v. Datatab, Inc.,* 722 F.2d 1, 5 (2d Cir.1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984).

Nor could the shareholders look to Chenango's other directors for representatives with undivided loyalty. Stack, Chenango's sole negotiator in the merger, and Mincolla, a director, were partners in a Florida real estate venture with the Koffmans since 1976. Mincolla invested substantially more in the real estate venture than in Chenango. This arrangement was not disclosed in the proxy statement. Full disclosure would have alerted the Chenango shareholders to these relationships between the directors of both boards.

### d. *Lancaster Towers*

The plaintiffs next argue that the proxy statement misrepresented the true worth of Lancaster Towers, a federally subsidized housing project that Chenango has owned and operated since 1974. The proxy statement briefly mentioned Lancaster Towers, stating only that Chenango had written down its investment in the property to zero

and that the property had been operating at a loss since the time of its acquisition by Chenango. The plaintiffs compare this description of Lancaster Towers to the information Chenango provided in the IDA loan application six months before the proxy statement was mailed. There, Lancaster Towers was valued net of mortgage at $1.1 million, only $100,000 less than the entire purchase price of Chenango. The IDA application also stressed the tax savings that Lancaster Towers provided, which would total $2.4 million over 20 years.

Had the plaintiffs received full disclosure, they would have learned that there was substantial value in the ownership of Lancaster Towers. The project was acquired only to provide tax benefits and it was succeeding toward that end. Dorshow, the defendants' expert witness, stated in his valuation report on Chenango that Lancaster Towers "was (and remains) an important part of the company's financial strategy and clearly contributes to cash flow and hence strengthens the company's earning power." Although, as the district court found, Stack may have been "aggressive" in preparing the sworn IDA application, 661 F.Supp. at 1566, Lancaster Towers presumably had a net worth in the neighborhood of $1.1 million. We must agree with the plaintiffs that the value of such a significant asset, with an ability to generate substantial tax savings, was materially misrepresented in the proxy statement.

### e. *Great American Corrugated Container Corporation*

Finally, the plaintiffs allege that the proxy statement overstated the value of GACCC, a subsidiary of GAI. GACCC had been losing money consistently, showing losses of $741,000 in 1977, nearly $2.5 million in 1978, and $2.1 million during the first six months of 1979. Only the 1977 and 1978 results were disclosed. The proxy statement stated that GAI had "reduced GACCC's losses but had not eliminated them."

The Chenango minority shareholders should have been informed of the losses

that GACCC incurred during the first six months of 1979. Ordinarily, a corporate parent need not disclose interim financial data of a subsidiary. 17 C.F.R. § 210.10–01(a)(1). Here, however, GAI made an affirmative statement that GACCC had reduced its losses. Under these circumstances, GAI should not have withheld from the shareholders the fact that GACCC had lost $2.1 million in the first six months of 1979 after having lost nearly $2.5 million in the entire previous year.

The proxy statement listed GACCC's assets at $12.9 million. In August of 1979, a representative of Lin Pac, a British company interested in acquiring GACCC, mentioned an acquisition price of $5 million. Several months after the merger was completed, Lin Pac purchased GACCC for a total consideration of $9 million.

The plaintiffs argue that Lin Pac's offer of $5 million should have alerted GAI to the reality that its $12.9 million estimate of GACCC's worth was obsolete. We agree. At board meetings in January and March of 1979, GAI directors had voiced their concern over the unprofitable situation at GACCC. In December of 1979, two months after the merger was approved, GAI estimated a $4 million loss on the sale of GACCC and reclassified its balance sheet to show assets of GACCC to be $7.7 million rather than the $12.9 million set forth in the proxy statement. GAI should have either reevaluated the worth of its subsidiary or informed the Chenango shareholders that GACCC was not likely to sell at its indicated value.

## III.

■ Under Rule 14a–9, plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive. *See Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1298–1301 (2d Cir.1973). Liability can be imposed for negligently drafting a proxy statement. *Id.* at 1301 n. 20. As a matter of law, the preparation of a proxy statement by corporate insiders containing ma-terially false or misleading statements or omitting a material fact is sufficient to satisfy the *Gerstle* negligence standard.

■ We find that all the defendants are liable under § 14(a) of the Act. Burton Koffman, Richard Koffman and Milton Koffman knew of the *United Rubber* decision at least two weeks before the Chenango shareholders voted on the merger. The district court's finding that nondisclosure was a deliberate decision demonstrates a culpable state of mind far in excess of negligence. The Koffmans were also aware of the false allegations in the proxy statement that GACCC had reduced its losses, and the misleading representation that GACCC was worth $12.9 million. GAI acquired a company experiencing unprecedented growth and the Koffmans, as directors and shareholders of GAI, stood to benefit most from the merger.

■ Stack's liability is also clear. Stack was Chenango's sole negotiator in the merger and was most responsible for the contents of the proxy statement. He prepared the IDA loan application and was aware of its approval. Stack also chose to describe Lancaster Towers in a misleading manner; and not to disclose the Florida real estate venture he and Mincolla had undertaken with the Koffmans.

■ The remaining Chenango directors were aware that the proxy statement was materially deficient. Dyer, Mincolla, Crounse, Starner, and Milton Koffman knew of the IDA loan approval and Chenango's substantial expansion plans. Each defendant knew of the misleading treatment of Lancaster Towers. In addition, Dyer was General Counsel to Chenango and drafted much of the proxy statement, yet there was no disclosure of his long-standing legal representation of the Koffmans. Mincolla must have been aware of the non-disclosure of his business relationship with the Koffmans, an endeavor substantially more meaningful to Mincolla than Chenango. Milton Koffman, as a director of both GAI and Chenango, was aware of all of the proxy statement's deficiencies.

## IV.

The district court's method of calculating damages is essentially a finding of law, and, as such is subject to appellate review. *Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 603 (2d Cir.1978). We hold that the plaintiffs are entitled to recover damages equivalent to the benefit of the bargain they would have obtained had full disclosure been made. The determination of damages should include a valuation of Chenango's future earning power, viewed prospectively from the date of the merger.

Despite the somewhat speculative nature of the defendants' profit as viewed from the date of the merger, once it is established that the defendants acquired the company by fraud, "the profit was the proximate consequence of the fraud;" it is thus "more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them." *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). When, as here, the fraudulent buyer received more than the seller's actual loss, damages are the amount of the defendant's profit. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972); *see also Osofsky v. Zipf*, 645 F.2d 107, 112–13 (2d Cir. 1981).

The defendants' argument that *Janigan* is limited to cases in which the purchaser resold the securities at a profit prior to the litigation is without merit. A court may award a plaintiff the unrealized appreciation of securities acquired through fraud. *Gerstle v. Gamble–Skogmo*, 478 F.2d at 1305.

The defendants' reliance on *Simon v. New Haven Board & Carton Co., Inc.*, 516 F.2d 303 (2d Cir.1975) to limit the plaintiffs' recovery to out-of-pocket damages is misplaced. In *Simon*, this Court articulated a two-part test to limit the recovery of profits under the *Janigan* defrauded seller doctrine. This test requires both "(1) that a wrongdoer might be profiting by his own wrong, and (2) that, even if there were fraud, the defrauded party might have been in the position of earning the profits it seeks from the wrongdoer." *Simon v. New Haven Board*, 516 F.2d at 306 (citing *Gerstle v. Gamble–Skogmo*, 478 F.2d at 1303–06). In the instant case, the first part of the test is satisfied by the fact that the fraudulent nondisclosure permitted the defendants to acquire Chenango at a price that did not accurately reflect its future profitability as projected by the defendants with their superior knowledge. The second part of the test is satisfied to the extent that the plaintiffs would have profited from a higher tender price had full disclosure been made. This prong of the test limits the profits properly recoverable to that amount that the minority shareholders might have realized upon sale of their securities had the information available to them included data concerning projections of the future profitability of Chenango.

The record leaves us with the firm conviction that at the time of the merger, Chenango's stock was worth considerably more than the value placed upon it in the proxy statement. In 1979, the company's expansion was underway. Its strong customer base featured IBM, which provided 46% of Chenango's business at the time of the merger. By 1984, Chenango's sales had doubled, its earnings had tripled and the book value of its stock had more than quintupled. Chenango acquired at least four subsidiaries before 1985 using its own working capital with no assistance from GAI. GAI guaranteed none of the debt of Chenango, provided no capital infusions to Chenango, and recovered its entire purchase price in two years with Chenango's earnings. In 1985, when the Koffmans took GAI private for the sum of $53 million, Chenango was providing 23.7% of the operating income of GAI. From this figure, Ronald Quintero, an expert witness for the plaintiffs, estimated that Chenango was worth between $10 million and $15 million in 1985. Quintero valued Chenango at $6 to $6.3 million at the time of the merger, using Stack's projections. Indeed, the record shows that Stack's projections closely tracked Chenango's performance.

The plaintiffs should be allowed another opportunity to prove their damages. Accordingly, we reverse the judgment of the district court and remand the case for further proceedings to assess damages and enter a judgment not inconsistent with this opinion. This panel will hear any further appeal in this matter.