

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-21-2003

# Shaev v. Saper

Precedential or Non-Precedential: Precedential

Docket 02-2206

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Shaev v. Saper" (2003). *2003 Decisions.* Paper 771.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/771

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed February 21, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2206

DAVID B. SHAEV,
        Appellant

v.

LAWRENCE SAPER; ALAN B. ABRAMSON;
DAVID ALTSCHILLER; JOSEPH GRAYZEL, M.D.;
GEORGE HELLER; ARNO NASH; DATASCOPE CORP.

Appeal from the United States District Court
For the District of New Jersey
D.C. No.: 01-CV-3744 (JAP)
District Judge: Honorable Joel A. Pisano

Argued: December 20, 2002

Before: SLOVITER, McKEE, and ROSENN, Circuit Judges.

(Filed: February 21, 2003)

        A. Arnold Gershon, Esq. (Argued)
        BALLON, STOLL, BADER & NADLER
        1450 Broadway, 14th Floor
        New York, NY 10018
         Counsel for Appellant




        Louis M. Solomon, Esq. (Argued)
        Andrew J. Levander, Esq.
        SWIDLER BERLIN SHEREFF
         FRIEDMAN
        405 Lexington Avenue
        The Chrysler Building
        New York, NY 10174
         Counsel for Appellees

OPINION OF THE COURT

ROSENN, Circuit Judge:

This case presents important questions pertaining to corporate governance and responsibility. They involve the application and alleged violations of Securities Exchange and Treasury Regulations with respect to shareholder proxy statements soliciting shareholder approval of executive incentive compensation plans. Datascope Corporation (Datascope or the Company), a corporation chartered under the laws of Delaware, has its principal place of business in Montvale, New Jersey, where it is engaged in the

manufacture of complex cardiology, vascular, and other medical proprietary products. The Company's board of directors (Board) issued a proxy statement to its shareholders soliciting support for an amendment to its Management Incentive Plan (MIP) which determined the bonus compensation to be awarded to Datascope's president, Lawrence Saper.

Datascope shareholder David Shaev brought a derivative lawsuit under the Federal Securities Exchange Act of 1934 and applicable regulations alleging that the proxy statement made false and misleading statements regarding material facts. The District Court dismissed Shaev's claim on the pleadings and declined to exercise supplemental jurisdiction over Shaev's excessive compensation claim under Delaware law. Shaev timely appealed. We vacate and remand.

I.

For the purposes of defendants' motion to dismiss, we must accept as true Shaev's allegations in his complaint

2

and make all reasonable inferences in his favor. Hayes v. Gross, 982 F.2d 104, 105-06 (3d Cir. 1992). The defendant's motion to dismiss automatically halted discovery. Thus, Shaev has not had the opportunity to substantiate some of his allegations.

Saper has been the Chief Executive Officer (CEO) and chairman of the Board of Datascope since 1964. Saper and his immediate family hold approximately 19% of Datascope's shares, which are traded on NASDAQ. As of July 1, 1996, Saper entered into an employment agreement with Datascope for a term of five years with an automatic extension, unless either party gave notice of an intent to terminate the contract. Saper receives an annual base salary with increases as determined by the Board or the Compensation Committee. On September 22, 1999, the Compensation Committee increased Saper's annual base salary to $1 million per year. Saper also became entitled to receive bonuses under various long-term and annual incentive compensation plans. On May 26, 1999, Saper received an immediately-exercisable option to purchase 70,000 shares of stock at an exercise price equal to the market price of the stock, expiring May 25, 2009. Using an option-pricing model, Shaev alleges that this option was worth $1,016,200. Additionally, the complaint alleges that Saper's annual lifetime retirement payments are worth approximately $1,406,400 per year and cost the company $10,000,000.

On December 7, 1999, Datascope adopted a supplemental Management Incentive Plan that provided for bonus payments to eligible executives. The payments were contingent on attainment of various corporate goals and some subjective criteria.1 The December 7, 1999,

1. The MIP is described as a Supplemental Incentive Plan, but it does not specify what it supplements. Datascope explained at oral argument that it supplements the previous 1997 Plan, which is not in the record nor described in the disputed proxy. Because of this omission, it is difficult to evaluate the relevance and effect of the 1997 incentive Plan and its interaction with the 1999 supplement and the 2000 amendment to the supplement. Unlike the 1997 Plan, the 1999 supplement is part of the record, although neither it nor its material terms were included in the proxy statement.

supplement provides "the precise terms and provisions of the performance goals" to calculate Saper's bonus, based on Datascope's earnings per share measured before extraordinary and/or special items.

On May 16, 2000, the Board's Compensation Committee amended the 1999 supplement. The Board adopted the 2000 amendment for a nine-month performance period commencing October 1, 1999, and continuing through July 30, 2000. The performance goals for that nine-month performance period were adopted on December 7, 1999. However, as of December 7, 1999, the maximum Saper bonus was $2,225,000. In the May 16, 2000, amendment, the Board increased to $3,285,714 the amount of compensation that would be awarded to Saper if Datascope met the performance goals adopted five months earlier. The performance period ended approximately six weeks later.

Under the 2000 amendment, Saper could have received 83% of the increase in the earnings of the company at the high end of earnings per share. As a shareholder, Saper would also get 19% of the remaining 17% if dividends were issued, leaving only 14% of the remainder to the shareholders.

On October 27, 2000, the Board issued a proxy statement in connection with its annual meeting to be held on December 12, 2000. The proxy statement solicited shareholder approval of the 2000 amendment. However, the proxy statement did not include the material features of the 1999 supplement which it amended, and it did not mention the 1997 Plan which the 1999 MIP supplemented.

The proxy statement explained that the Board intended to administer the amendment in a way that would allow the Company to deduct bonuses and incentive payments for tax purposes. Furthermore, the proxy stated that "[s]hareholder approval of the Management Incentive Plan is required in order for the Management Incentive Plan to be effective and for bonuses payable thereunder to a 'covered employee' within the meaning of Section 162(m) . . . to be deductible under 162(m) of the Code."

Saper earned $3,285,714 in bonus compensation in FYE 2002. According to the proxy statement, $1,485,714 of that

amount was subject to shareholder approval of the amendment. See Dist. Ct. op. at A 6. The proxy statement also stated that "[i]n the event that the Management Incentive Plan is not approved by the shareholders of the Corporation, the Compensation Committee may grant Mr. Saper another bonus for FYE 2000, a portion of which may not be deductible under Section 162(m) of the Code." On December 12, 2000, the Board submitted the amendment for shareholder approval at Datascope's annual meeting. The shareholders approved the amendment and the bonus payment to Saper.2

Shaev filed a derivative action in the United States District Court for the District of New Jersey. Shaev did not make a demand on the Board prior to filing suit because he alleges that demand would have been futile and was, therefore, excused. Shaev asserts that the proxy statement erroneously stated that a bonus to Saper would be tax deductible to Datascope if it was approved by the shareholders. Shaev asserts that regardless of whether the shareholders voted for the Plan, the Company would not get the full deduction. Shaev also alleges that the proxy statement contained a material omission because it failed to include or even mention the original 1997 MIP that was being amended. Without the original 1997 MIP or a statement of the material terms of its 1999 supplement, Shaev alleges that the shareholders had no way of knowing that the proposed Saper bonus exceeded the amount to which he would have been entitled under the 1999 supplement's performance goals. Shaev also alleges that Saper's compensation was excessive under Delaware law.

On April 2, 2002, District Judge Pisano dismissed Shaev's securities claim with prejudice under Fed. R. Civ. P. 12(b)(6). Judge Pisano declined to assert supplemental jurisdiction over the state law claims, which he dismissed without prejudice. See A 2.

---

2. On December 6, 2000, Shaev filed a direct action against defendants in the New York State Supreme Court. That action is still pending, but the parties have orally agreed to stay the action pending resolution of the current suit.

II.

The threshold question we must decide is the validity of the defendants' challenge to the plaintiff 's right to sue in behalf of the Company without first having made a demand upon its Board of Directors to take appropriate action for relief. In a derivative lawsuit, the shareholder must make a demand on the board of directors of the corporation to take action to correct the wrongdoing, or allege the reasons for

the plaintiff 's failure for not making the effort. See Fed. R. Civ. Proc. 23.1. The demand requirement ensures exhaustion of intra-corporate remedies, thereby possibly avoiding litigation in the first place. Additionally, it gives the corporation an opportunity to pursue claims that the Board believes are meritorious and seek dismissal of the others. Finally, when demand is wrongfully refused by the Board or excused because demand would have been futile, the shareholder is free to seek relief by court action. Allright Missouri, Inc. v. Billeter, 829 F.2d 631, 639 (8th Cir. 1987); accord Untermeyer v. Fidelity Daily Income Trust, 580 F.2d 22, 23-24 (1st Cir. 1978).

Shaev alleges that he brings this action derivatively as the right of and for the benefit of the Company. He asserts that he has been a stockholder of the Company continuously for many years and throughout the period of the alleged wrongs. He acknowledges that he made no demand upon the Board of Directors of the Company to file and prosecute this action "because such demand would be futile and, therefore, excused." In support of his claim of futility, he avers that three of the six members of the Board are financially interested in Saper's payments. Saper, of course, was the beneficiary of the stock options and incentive benefits set up for him. The other two board members, defendants Altschiller and Grayzel, are alleged in the complaint to lack independence because their consulting fees, bonuses, stock options and other perquisites are subject to Saper's control.

Plaintiff further alleges that under Delaware law, demand on the Board of Directors is excused when three of the six Board members are neither disinterested nor independent. Furthermore, the complaint alleges that the entire Board is neither disinterested nor independent since every member

6

of the Board is potentially liable for a violation of S 78n(a) of the Exchange Act and Rule 14a-9.

The District Court did not address this issue; however, the parties have briefed it on appeal. Under Delaware law, a demand on a board of directors is excused where half of the members of an even numbered board are alleged to be interested or lack independence. Beneville v. York, 769 A.2d 80, 86 (Del. Ch. 2000) ("As a doctrinal matter, it thus makes little sense to find that demand is refused in an evenly divided situation."). The complaint also alleges that Saper, as Chief Executive Officer, has the power to engage consultants. Board member Altschiller has since September 1, 1998, been a consultant for the Company, initially at $100,000 per year, but his compensation was increased on December 1, 1998, to $135,500 per year. In August 1999, he was given a discretionary bonus of $25,000. He has also been the recipient of options to purchase Company stock. The complaint further alleges that he is "financially dependent and beholden" to Saper for his consulting engagement fees and benefits he receives from the

Company.

As for Board member and defendant Grayzel, the complaint alleges that he has been a consultant for the Company since January 1968 and was paid fees "of $161,700 in each of the fiscal years ending 1998, 1999, and 2000." In addition, the complaint avers that the Company paid him a discretionary bonus of $30,000 in FYE 1998 and 1999, and granted him stock options as well; that he too is dependent and beholden to Saper for consulting engagement fees and benefits he receives from the Company.

All of these allegations, for the purpose of the motion to dismiss, must be taken as true. Under Rales v. Blasband, 634 A.2d 927, 936-37 (Del. 1993), an interested director is one who receives a financial benefit from a corporate transaction. Saper, Altschiller and Grayzel are allegedly interested directors, and it is alleged that they constitute half of the Board. Shaev alleges that a demand on the directors for remedial action would have been futile. If so, demand would be excused because the interest of the Board in the situation was, at the very least, evenly divided.

On remand, the parties can pursue the factual issues relevant to the futility of demand through the use of discovery.

There is no point, therefore, to discuss plaintiff 's additional allegations that demand is excused under federal law, were we to decide that Delaware law was to the contrary.

III.

Under the Securities Exchange Act, it is unlawful to solicit proxies in contravention of "such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C.S 78n(a). SEC Rule 14a-9 states in relevant part:

> No solicitation subject to this regulation shall be made by means of any proxy statement . . . which, at the time . . . it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. S 240.14a-9.

Shareholders have an implied cause of action to seek relief when a false or misleading proxy statement interferes

with "fair corporate suffrage." J.I. Case v. Borak, 377 U.S. 426, 431-32 (1964). Section 14(a) seeks to prevent management or others from obtaining authorization for corporate actions by means of deceptive or inadequate disclosures in proxy solicitations. J.I. Case , 377 U.S. at 431; Gould v. Am.-Hawaiian S.S. Co., 535 F.2d 761, 277-78 (3d Cir. 1976). This is a highly important rule in the corporate life of this nation. A proxy statement should inform, not challenge the reader's critical wits. See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097 (1991). Also, it should not make stockholders unwitting agents of self-inflicted damage. Id. at 1103.

8

To state a claim under S 14(a), a plaintiff must allege that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction.' " Gen. Elec. Co. by Levit v. Cathcart, 980 F.2d 927, 932 (3d Cir. 1992). An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. See TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 384 (1970).

The Internal Revenue Code (IRC) generally disallows deductions for employee remuneration in a publicly held corporation in excess of $1 million. IRC S 162(m)(1). However, the IRC contains exceptions for a narrow set of incentive programs, among which is a properly established employee incentive plan approved by the shareholders. The IRC provides in relevant part for the deductibility of remuneration to an applicable employee

> only if-- (i) the performance goals are determined by a compensation committee of the board of directors of the taxpayer which is comprised solely of 2 or more outside directors, (ii) the material terms under which the remuneration is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of such remuneration.

IRC S 162(m)(4)(C).

Likewise, the Treasury Regulations elaborate on the exception for the $1 million deduction limit under IRC S 162(m) when a compensation plan meets certain criteria for qualified performance-based compensation. See 26 C.F.R. S 1.162-27(e).3

---

3. The Treasury Regulations require: "Qualified performance-based compensation must be paid solely on account of the attainment of one or more preestablished, objective performance goals. A performance goal

is considered preestablished if it is established in writing by the

9

Companies may only deduct annual compensation in excess of $1 million pursuant to a Plan that is performance-based and approved by the company's stockholders. Here, the plaintiff alleges that the proxy statement falsely represents that the Saper bonus would qualify for an income tax deduction for the Company if the stockholders approved it. This statement is false or misleading, the complaint alleges, because the deduction was unavailable, regardless of the shareholders' approval because: (1) the 2000 amendment to the Plan was established too late for the performance goals to comply with the Regulations; (2) deductibility is destroyed if the bonus amount could be increased during the performance period; and (3) the Board's threat to take the deduction regardless of shareholder approval obviates its deductibility, even if approved.

Shaev's complaint that the 2000 amendment to the Plan was established too late to qualify for a deduction is well made. The Regulations require that a qualified performance goal be established not later than the ninetieth day of the performance period or before twenty-five percent of the performance period has elapsed. The supplement was adopted in December 1999, halfway through Datascope's fiscal year, and then restated in May 2000. December was too late to establish the necessary performance goals to receive the deduction because the Company's fiscal year ended in June 2000. By adjusting the amount of the

_____

compensation committee not later than 90 days after the commencement of the period of service to which the performance goal relates, provided that the outcome is substantially uncertain at the time the compensation committee actually establishes the goal. However, in no event will a performance goal be considered to be preestablished if it is established after 25 percent of the period of service (as scheduled in good faith at the time the goal is established) has elapsed." 26 C.F.R. S 1.162-27(e)(2). "(4) Shareholder approval requirement -- (i) General rule. The material terms of the performance goal under which the compensation is to be paid must be disclosed to and subsequently approved by the shareholders of the publicly held corporation before the compensation is paid. The requirements of this paragraph . . . are not satisfied if the compensation would be paid regardless of whether the material terms are approved by shareholders." Id. at S 1.162-27(e)(4).

10

incentive compensation in May 2000 and shortening the time period to less than a year, Datascope's Board hoped to circumvent the Regulations which allow corporations to create incentives for executives to meet objective, uncertain goals. As an incentive, the outcome of a performance goal, of course, must be substantially uncertain at the time the compensation committee establishes the goal. 26 C.F.R.

S 1.162-27(e)(2)(i). The Company's alleged manipulation of the performance goals undermined the goals' character as "preestablished" and "objective." The performance period for the 1997 incentive plan was "a 12-month performance period that is adopted each year going forward." The nine-month performance period was adopted for the 2000 year plan "[b]ecause the Company wanted to be able to take advantage of the tax deduction that it was entitled to receive if it were a nine-month performance period."

In the absence of special circumstances, such as when a new company is formed or when an established company changes its fiscal year in good faith, a performance period shorter than one year makes it much less likely that the MIP will meet this requirement. On the facts as alleged, Datascope's performance period was too short to meet the Treasury Regulations requirements and improperly impaired their purpose. The incentive plan was only an exception to the general rule that salaries exceeding $1 million were not tax deductible. Therefore, an incentive program that allowed in excess of $1 million must comply strictly with the performance requirements set down by the Treasury Regulations.

Furthermore, even if the Company had established a long enough performance period, the existence of discretion to increase the amount of the bonus so late in the performance period undermined its deductibility. Under the Treasury Regulations, if there is discretion to increase the calculated bonus, the deduction is lost. See 26 C.F.R. S 1.162-27(e)(2)(iii)(A) ("The terms of an objective formula or standard must preclude discretion to increase the amount of compensation payable that would otherwise be due upon attainment of the goal") (emphasis added). Even though the performance goals were set in December, 1999, the amount

of the compensation was changed on May 16, 2000, thereby undermining deductibility.4

Payments of the Saper bonus, even if the shareholders voted against it, also precluded the deduction. The Regulations state that "[t]he material terms of the performance goal under which the compensation is to be paid must be disclosed to and subsequently approved by the shareholders of the publicly held corporation before the compensation is paid. The requirements of this paragraph . . . are not satisfied if the compensation would be paid regardless of whether the material terms are approved by shareholders." 26 C.F.R. S 1.162-27(e)(4)(i). The Board's threat undermined the deductibility of the bonus even if the shareholders approved it.

The complaint accurately alleges that Datascope's Board made a materially false statement in the proxy statement when it stated that the bonus would be deductible if the shareholders approved it. Regardless of the shareholders' approval, the bonus would not have been deductible under

the Treasury Regulations, and the alleged false statement in the proxy statement is actionable.5

IV.

The allegations in the complaint that the Board failed to include the 1999 supplement in the proxy statement

---

4. The defendants argue that there was no discretion because the shareholders, not the Board, made the relevant changes to the performance goals. The problem with this reasoning is the timing. If the MIP could be changed retroactively, the terms are not pre-established. If they can only be changed prospectively, the time period would be six and a half weeks, altogether too short to comply with the Treasury Regulations. 26 C.F.R. S 1.162-27(e)(2).

5. Judge Sloviter notes that the District Court's conclusion that a one-year period is not required by the regulations is supported by an IRS private letter ruling by Robert Misner which recognizes that a performance period under a deductible plan "may be as short as a single calendar quarter." Private Letter Ruling, PLR 1999 50021, 1999 WL 1208442 (Dec. 17, 1999). Although a private letter ruling may not be cited as precedent, IRC S 6110(k)(3), the District Court may have deemed it instructive.

amounted to a material omission under SEC Rule 14a-9. Similarly, it was a material omission for the Board to fail even to mention the existence of the 1997 Plan. Counsel for the defendants concedes that the proxy statement would not have informed a hypothetical investor who bought Datascope stock on December 31, 1999, about the existence of the 1997 Plan. He argues, however, that this was not a material omission because the hypothetical investor would have been advised by the proxy statement that there was a separate bonus other than the MIP; the hypothetical investor could have contacted "the investor relations department at the Company to obtain past filings."

We hold that the cryptic references in the proxy statement were insufficient to satisfy Datascope's disclosure obligations under Rule 14a-9. Material not included in the proxy statement is generally not charged to the knowledge of the stockholder. Cf. Koppel v. 4987 Corp., 167 F.3d 125, 132 (2d Cir. 1999) (document that was only available at defendants' offices during business hours, but not incorporated by reference in the proxy statement, was not treated as part of the "total mix" of information available to participants for 14a-9 purposes). That an investor could hypothetically conduct research to clarify ambiguities and discover omissions in the proxy statement does not relieve the Board of its obligations under Rule 14a-9. Defendant's counsel conceded at oral argument that the proxy statement "may not be the model of clarity and in hindsight it could have been drafted differently to lay out additional information. . ." We agree. A proxy statement should

inform, not challenge a shareholder's critical wits. See Virginia Bankshares, 501 U.S. at 1097.

The Proxy Statement's omission of the performance goals is material because the stockholders had no way of knowing that Saper had not earned the $3,285,714 bonus under the terms of the currently existing plan. The Proxy Statement contains no discussion of the 1997 Plan or how the 2000 amendment compares with the 1999 supplement or the 1997 Plan.[6] The defendants respond that the two

6. The defendants assert that "Appellant's claim that the bonus payable to Mr. Saper under the 2000 Plan exceeded the original maximum

13

Plans have little to do with one another: "there was no need to publish the 1997 Plan again in the Proxy Statement nor was there a need to compare it to the 2000 Plan since both were to be in effect if the shareholders approved the 2000 Plan." This argument is sophistical because the 2000 amendment was not a stand-alone Plan. On the contrary, it was an amendment to an unstated supplement. To determine the overall incentive effects, stockholders would have had to read the three documents together, and they did not have them.

The terms of the 1997 Plan and the 1999 supplement are also relevant to the stockholders' assessment of the truth of the statement that the bonus would be tax deductible if approved. Assuming arguendo that the IRS treatment of the bonus was uncertain at the time of the proxy statement, a reasonable investor might take this uncertainty into account in deciding whether to vote to authorize the bonus. The risk that the bonus might not be tax deductible and the information necessary to determine whether it was deductible were material to the average investor's action at the time of the proxy statement, even if the IRS or a court should ultimately reject Shaev's argument.

The 1997 Plan and the 1999 supplement were also relevant to the shareholders' consideration of the 2000 proxy because the Board was asking the shareholders to approve a retroactive increase in Saper's bonus. There is no authority that the Board has the power to increase Saper's bonus retroactively. By failing to include the 1999 supplement in the proxy, the Board effectively asked the shareholders to do what the Board itself could not do, and without any notice to stockholders that they were doing it.

amount of $2,225,000 is inaccurate." They explain that $1,800,000 was payable pursuant to the 1997 Plan and $1,485,714 was payable under the 2000 plan subject to shareholder approval. However, the combined amount of $3,285,714 is more than $2,225,000, the original maximum. At oral argument, the defendants tried to clear up "a misunderstanding in the record" related to this point. However, the 1997 Plan is not even in the record, and the defendants' explanation does not point to

convincing record evidence that the maximum Saper bonus was not increased by the 2000 amendment. Thus, the defendants have failed to carry their burden on this issue.

14

The District Court erred in concluding that 26 C.F.R. S 1.162-27(e)(4) insulates Datascope's Board from a claim under 15 U.S.C. S 78n(a) and Rule 14a-9. The District Court held that "applicable regulations clearly state the proxy statement need not disclose exactly that information which plaintiff claims Datascope shareholders were entitled [sic] so that they could determine whether executives merit the bonuses the Board intends to award." See Dist. Ct. op. at A 11. Even though the proxy statement did not have to reveal "specific business criteria" it does not follow that the proxy statement did not have to disclose the material terms of the existing incentive plan which would have demonstrated to the shareholders that the proposed bonus substantially would exceed the amount to which Saper would have been entitled under the extant MIP and to what extent.

The District Court misread the federal regulations when it concluded that Shaev's complaint demanded access to specific business criteria that the Board was not required to disclose. It is true that under 26 C.F.R. S 1.162-27(e)(4)(iii)(A), the specific business criteria upon which bonuses are contingent need not be disclosed in proxy statements. See Dist. Ct. op. at A 12.7 However, the material terms of the incentive plan and general performance goals on which the executive's compensation

_____

7. The District Court opinion misreads another regulation, 17 C.F.R. S 240.14a-101. The regulation requires in pertinent part that, "plans subject to security holder action" (1) briefly describe "the material features of the plan acted upon, each class of persons who will be eligible to participate therein, indicate the approximately number of persons in each such class . . . (2) [and] such benefits or amounts [as] are determinable." 17 C.F.R. S 240.14a-101(Item 10). The court interpreted the regulation to mean that registrants do not need to disclose specific targets upon which bonuses are contingent. Its opinion, however, does not specify where in the somewhat lengthy provision it finds support for its interpretation. Item 10 explains that when the Board solicits shareholder approval for a compensation Plan, the proxy statement must describe briefly the material features of the Plan and disclose the amount of the benefit if determinable. Contrary to the District Court's reading, 17 C.F.R. S 240.14a-101 does not affirmatively state that registrants do not need to disclose specific targets upon which businesses are contingent.

15

is based must, at a minimum, be disclosed. This position is supported by the Legislative History of the IRCS 162(m), which states:

> In order to meet the shareholder approval requirement, the material terms under which the compensation is to be paid must be disclosed . . . It is intended that not all the details of a plan (or agreement) need be disclosed in all cases . . . To the extent consistent with [the SEC] rules, however, disclosure should be as specific as possible. It is expected that shareholders will, at a minimum, be made aware of the general performance goals on which the executive's compensation is based and the maximum amount that could be paid to the executive if such performance goals were met.

See H.R. Conf. Rep. No. 103-213, at 587-88 (1993).

We conclude that pertinent information in the 1997 Plan and notice that the proposed bonus substantially would exceed the amount to which Saper would have been entitled under the 1999 supplement were "material" within the meaning of IRC S 162(m)(4)(C)(ii), even though the "specific business criteria" discussed in 26 C.F.R. S 1.162-27(e)(4) are not.8 We, therefore, hold that a proxy soliciting shareholders' approval of a proposed executive incentive compensation plan, which refers to an existing incentive plan, must disclose the material features of both plans. It must also state, if determinable, the amount of the increased benefits and performance goals under the proposed plan.

The District Court erred when it held on a Rule 12(b)(6) motion that the existence of the prior bonus Plan was not material. See Dist. Ct. op. at A 11. The allegations in the complaint were material unless the alleged

---

8. 17 C.F.R. S 240.14a-101 and Fed. Sec. L. Rep. (CCH), Reg. S-K S 229.402(k) are not to the contrary. Regulation S-K applies to "specific quantitative and qualitative performance-related factors considered by the committee (or board). . ." Again, the use of the term "specific" limits the scope of the exclusion to the specific details of the Plan, but does not address whether weightier issues such as the existence of a former plan or non-fulfillment of its requirements need to be disclosed.

16

misrepresentations and omissions were "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." Shapiro v. UJB Financial Corp., 964 F.2d 272, 280-81 n.11 (3d Cir. 1992). The defendants argue that whether the bonus was tax deductible was immaterial because the deduction would represent a small figure in comparison with the $300 million revenues of the company. See In re Westinghouse Sec. Litig., 90 F.3d 696, 715 (3d Cir. 1996) (holding that a write-down of .54% of net income was not material). 9 Although the potential deduction is small in relation to the overall budget, the deduction is nevertheless material because the Treasury Regulations required management disclosure and stockholder approval of the principal

features of the incentive plan in order to qualify for the deduction. Thus, materiality of the required disclosure is not dependent on the quantity of money involved but on its purpose of informing the stockholders.10

V.

The District Court may decline to exercise supplemental jurisdiction over state law claims when the District Court has dismissed all claims over which it has original jurisdiction. See 28 U.S.C. S 1367(c); Dist. Ct. op. at A 12. Because the District Court erred in dismissing the federal securities claims, we vacate the District Court's dismissal of Shaev's state law claims under 28 U.S.C. S 1367(c) and

---

9. Cf. Wilson v. Great Am. Indus., Inc., 855 F.2d 987, 994 (2d Cir. 1988) (holding that it is fraudulent to fail to disclose a material amount of tax savings).

10. The complaint alleges that among the material omissions in the proxy were reasonable estimates of the bonus payable and the number of eligible executive participants under the Plan. The Security Regulations provide that proxies soliciting shareholder approval for compensation plans must "[d]escribe briefly the material features of the plan being acted upon, identify each class of person who will be eligible to participate therein, indicate the approximate number of persons in each such class, and state the basis of such participation." 17 C.F.R. S 240.14a-101 (Item 10(a)(1)). These allegations raise important questions pertaining to material violations of the Security Commission's Regulations.

17

remand for its consideration in light of the decision we reach on this appeal.

VI.

To recapitulate, the plaintiff has stated a cause of action on the following grounds: (1) the proxy statement failed to disclose the existence and material terms of the 1997 Plan; (2) the proxy statement failed to disclose the material terms of the 1999 supplement. Importantly, it did not disclose that the amount of compensation to which Saper would be entitled under the 2000 amendment exceeded the $2,225,000 compensation maximum established under the 1999 supplement; (3) the proxy statement omitted the number of eligible executive participants under the Plan, in violation of the Securities Exchange Regulations, 17 C.F.R. S 240.14a-101; (4) the proxy statement contained affirmative statements that were false or misleading in violation of Rule 14a-9 when it stated that a bonus to Saper would be tax deductible to Datascope if it was approved by the shareholders. This statement was false or misleading because (a) the 2000 amendment to the Plan was established too late for the performance goals to comply with the Treasury Regulations; (b) deductibility is destroyed if the bonus amount could be increased during the

performance period; and (c) the Board's threat to take the deduction regardless of shareholder approval obviates its deductibility even if approved. 26 C.F.R. S 1.162-27(e)(2); id. at S 1.162-27(e)(4).

Accordingly, the District Court's order dismissing Shaev's securities claim will be vacated and the case remanded to the District Court for further proceedings consistent with this opinion. Costs taxed against the appellees.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit